# CHARLESTON

CHARLESTON GAS CO. *v.* KANAWHA GAS CO.

Submitted April 11, 1905.   Decided April 25, 1905.

1. GAS COMPANIES—*Merger—Contracts Void as Against Public Policy.*

    If two corporations supplying the same community with natural gas make an agreement whereby they parcel out between them the territory, giving to each *exclusive* right to sell gas in a given boundary, fixing prices, and prohibiting change of prices except by their mutual consent, binding one company to use for public consumption only gas produced by the other, and prohibiting one from producing from the section of country in which the other produces gas; such agreement tends to monopoly, is void as against public policy, and the courts will not enforce it.   (p. 25).

2. PUBLIC POLICY—*Contracts Against—Courts Will Not Enforce.*

    Courts decline to enforce contracts which impose restraint, though only partial, upon business of such character that such restraint will to any extent repress competition and prejudice the public.   (p. 26).

3. CONTRACTS AGAINST PUBLIC POLICY—*Common Law Rule.*

    The common law condemns, as against public policy, agreements between public service corporations, of a character to prevent free competition in the interest of the public, and will not enforce them.   (p. 26).

4. CONTRACTS VOID AS AGAINST PUBLIC POLICY.

    Any agreement between competing public service corporations, the consequence of which is the controlling prices, limiting of production, or suppressing of competition, so as to create monopoly in things useful to the public, is contrary to public policy and void.   (p. 27).

5. VOID CONTRACTS.

    A combination, the object of which is to obtain sole control of a particular branch of business, is unlawful by common law, against public policy, and all contracts for the accomplishment of this end are void.   (p. 27.)

Appeal from Circuit Court, Kanawha County.

Action by the Charleston Natural Gas Company against the Kanawha Natural Gas, Light & Fuel Company and others.   Decree for defendants, and plaintiff appeals.

*Affirmed.*

BROWN, JACKSON & KNIGHT, SIMMS & ENSLOW, and WEIL & THORP, for appellant,

HAGAR & STEWART, CHILTON, MACCORKLE & CHILTON, PAM & HURD, MOLLOHAN, MCCLINTIC & MATHEWS, MCCOMAS & NORTHCOTT, and HOLT & DUNCAN, for appellees.

BRANNON, PRESIDENT:

The Charleston Natural Gas Company is a corporation chartered to furnish natural gas, having a supply field in Boone county, from which it piped gas for consumption in Charleston. The Kanawha Natural Gas, Light and Fuel Company is also a corporation for the production and sale of natural gas. It had a supply field in a territory partly in Roane county, partly in Kanawha county, and had laid pipes from that field to the city of Charleston, and was about to lay pipes in its streets to furnish gas for public use. The Charleston Company already occupied the streets with its distributing pipes. The latter company had also leased some territory in Roane county, and its Boone county field furnishing a poor supply of gas, it was boring wells in Roane county and was about to run a pipe line from its Roane county field to Charleston to aid its supply from Boone county. In this state of things, 20th January, 1903, the two corporations made a written agreement. It gave the Charleston Company "exclusive right to sell natural gas in" a certain section comprising the main city of Charleston and a large area besides, and gave to the Kanawha Company exclusive right to sell gas in another section adjoining Charleston, also quite a large area. The agreement contained these provisions: "Second. The parties hereto mutually agree that neither of them will, during the life of this agreement, sell or distribute gas in the territory hereby allotted to the other; nor will either party permit any other person or corporation to operate or sell gas under its ordinances in the territory of the other. Third. The Charleston Company agrees that it will not operate for gas, drill wells or acquire territory for gas purposes within the territory now occupied by the Kanawha Company, and described as follows: Big Sandy district of Kanawha county, West Virginia, and the Geary and Walton Districts of Roane county, West Virginia, during the term of this agreement. Fourth. The Charleston Company agrees to take all the gas required for its business under this agreement, from the Kanawha Company, at all times during the period of this

agreement, provided the Kanawha Company is able to supply the same, under the terms of this agreement." The agreement also provides that the Kanawha Company shall bring to Charleston gas from its field, and that when brought to Charleston to its regulator it shall be for joint use, the Kanawha Company to supply and the Charleston Company to accept from the Kanawha Company the gas necessary to supply the customers of the Charleston Company. The agreement divides the earnings in certain proportions between the two corporations. The agreement to last twenty years. This agreement was carried out, and business carried on under it. Recently a third company, The United States Gas Company, comes into the field. It is engaged in laying a gas pipe line from the city of Huntington to the supply field of the Kanawha Company in Roane and Kanawha counties to supply Huntington, and likely Portsmouth and Ironton, Ohio, and Ashland and Catlettsburg, Kentucky. The Kanawha Company made an agreement to transfer and assign to the United States Gas Company its assets, leases and wells—its entire supply field in Roane and Kanawha counties, in consideration of stock and bonds of said United States Gas Company. The Charleston Company filed its bill in the circuit court of Kanawha county alleging that the Kanawha Company proposed to surrender its charter and discontinue business after its property and assets should be transferred to the United States Company; that the laying of a gas pipe line into said supply field for the supply of gas to other cities and sections, especially the large pipe intended to be laid, will result in a speedy depletion in the supply of gas from said gas field, and end in its exhaustion within five years, and in irreparable damage to the Charleston Company in leaving it without a supply of gas for its business—in violation of the duty and obligation of the Kanawha Company under said contract to supply the Charleston Company with gas. The bill asked an injunction enjoining the Kanawha Company from transferring its assets and property, particularly said gas territory, to the United States Company, and enjoining both companies from laying any gas line into said gas territory; asking that the said Kanawha Company be enjoined from discontinuing business; and that said agreement be specifically enforced, and said territory be held by said Kanawha Company to answer

the end and purposes of said agreement.    A preliminary injunction was granted, but was later dissolved, and the Kanawha Company appeals.

The plaintiff's bill for relief rests on the contract between the two gas companies.    That contract is challenged as void and not a valid ground of action in a court of justice, because an unlawful agreement contrary to public policy as creating a monopoly in an article necessary for public use for fuel and illumination and tending to suppress competition and impose on the public inordinate prices for it.    At one time monopoly meant a grant from King or State of an exclusive right to manufacture or sell certain things; but now it means "any combination the tendency of which is to prevent competition, in its broad and general sense, and to control prices to the detriment of the public."    20 Am. & Eng. Ency. L. (2d Ed.), 846; 4 Bl. Com. 159.    In the days of Elizabeth monopoly grants were as numerous as flies.    Hume's History of England, 335.    When a list was being read in Parliament a member exclaimed, "Is not *bread* in the number?"    "Bread," said some one.    "Yes, I assure you, if affairs go on at this rate, we shall have bread reduced to a monopoly before next parliament."    It has come to that pass verily in our day.    The courts have always condemned monopoly when brought before them.    They must continue to do so.    They are the bulwark of the public safety.    Other branches of government may indulge monopolies, the courts cannot.    They are leaning more and more against it in every form.    These two corporations were chartered by the State for public service and benefit.    "The supply of illuminating gas is a business of a public nature to meet a public necessity.    It is not a business like that of an ordinary corporation engaged in the manufacture of articles that may be furnished by individual effort.    Hence, while it is justly urged that those public rules which say that a given contract is against public policy, should not be arbitrarily extended so as to interfere with the freedom of contract, yet in the instance of business of such character that it presumably cannot be restrained to *any extent whatever*, without prejudice to the public interest, courts decline to enforce or sustain contracts imposing such restraint, *however partial*, because in contravention of public policy.    The subject is much considered and the authorities

cited in *W. Va. Tr. Co.* v. *O. R. Pipe Co.*, 22 W. Va. 600; *Chicago Gas L. Co.* v. *Peoples Co.*, 121 Ill. 530; *Western Union Co.* v. *Union Co.*, 65 Ga. 160." *Gibbs* v. *Consol. Gas Co.*, 130 U. S. 390. Gibbs rendered service in effecting a combination of Baltimore gas companies, fixing rates chargeable on mutual consent, and he was denied recovery for services because of the illegality of the contract. The general principles stated in *Trans. Co.* v. *Pipe Line Co.*, 22 W. Va. 600, condemn this contract, because a contract between corporations giving to each exclusive right to furnish gas in certain areas, and *fixing* prices dependent for change upon mutual consent. This contract stifled competition and placed the public at the mercy of the corporations as to prices. Within a large extent of ground, including the city of Charleston and adjoining territory containing thousands of people, it debarred one company from operating in one section, the other in another. It prohibited the Charleston Company from producing gas in a certain territory, though it had leases in it. It prohibited either company from allowing a competitor to sell gas under its franchise. It could not sell gas to another supplier. Nor was the Charleston Company to buy gas from another seller than the Kanawha Company. It is hard to see how there could be furnished a plainer instance of monopoly. Far back in the English common and statute law monopolies were condemned. Brannon's Fourteenth Amendment, 132. In *Darcy* v. *Allen*, (1602), 11 Coke 84, a grant from the crown of a monopoly was held void. As to the evil the court said: "The price of the same commodity will be raised; for he who has the sole selling of any commodity may and will make the price as he pleases." In 1623 the ruling in the Darcy case was approved by an English act declaring prior monopoly grants void and no longer of effect. In the reign of Edward VI an act condemned the old modes of monopoly and restraint of trade called regrating, forestalling and engrossing. Parliament often legislated against monopoly. It has assumed varied forms in later days. "Trusts" are common, made with intent to monopolize under another name. It still remains common law. "A combination, the object of which is to obtain control of a particular branch of business, is a conspiracy, and all contracts for the accomplishment of this end, are void. So far as relates to

its legality the extent of the combination is immaterial. It may be confined to a single city or town, or it may extend to a state or a number of states, or it may include the country. The gist of the offence is the conspiracy or the combination for the purpose of accomplishing the end sought." Beach on Monopoly, section 81. The supreme court of Pennsylvania said in a celebrated case on monopoly: "A combination is criminal whenever the act to be done has a necessary tendency to prejudice the public or oppress individuals, by unjustly subjecting them to the power of the confederates, and giving effect to the purposes of the latter, whether of extortion or of mischief.     *     *     Men can often do by the combination of many what severally no one could accomplish, and even what, when done by one, would be innocent." *Morris Run Co.* v. *Barclay Coal Co.*, 68 Pa. St. 186. Our own late case, *Slaughter* v. *Thacker Coal Co.*, 55 W. Va. 642, held void, as against public policy in suppressing competition, an agreement between coal companies to put their entire output into the hands of another corporation to sell, fixing price, and prohibiting sale at less than as agreed between them. Action on it for its breach was denied. In *Harding* v. *American Glucose Co.*, 182 Ill. 551, (74 Am. St. R. 189), it is laid down for law that, "any combination of competing corporations, the necessary consequence of which is the controlling of prices, or limiting production, or suppressing competition, in such a way as to create a monopoly, is contrary to public policy and void. An agreement *tending* to prevent competition and create a monopoly is void by the principles of the common law, because it is against public policy." In *Chicago Gas L. Co.* v. *People's Co.*, 121 Ill. 530, was an agreement between two gas companies dividing the city into two sections, giving one section to each company, binding them not to lay pipes or sell gas in the sections of each other. Just this case. The decision was: "A private corporation to which is granted by its charter the privilege of manufacturing and supplying a city and its inhabitants with gas for illuminating purposes, can not, by contract with any other company, disable itself from the performance of its duty to the public, and transfer, absolutely, its right to furnish gas to any part of the city, and a court of equity will not enforce such a contract, it being contrary to public policy." If two

companies having permission to supply natural gas to a city make an agreement fixing the price of gas to consumers, and stipulating that neither company will furnish gas to patrons of the other, such "agreement is a restriction upon fair competition, and creates, at least, a basis for monopoly. It is therefore unlawful." *State* v. *Nat. Gas Co.*, 153 Ind. 483, 74 Am. St. R. 314. It declares for the old rule, "Competition is the life of trade." A combination of two coal companies to give a monopoly on coal was involved in *Arnot* v. *Pittston*, 68 N. Y. 558. The court said: "A combination to effect such a purpose is inimical to the interests of the public, and all contracts designed to effect such an end are contrary to public policy and therefore illegal." "It is no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted on the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public." The old New York case in 1844, *Stanton* v. *Allen*, 5 Denio 434, held void an agreement between owners of boats to fix rates and binding members not to engage in business outside the association. *Cent. Ohio Salt Co.* v. *Guthrie*, 35 Ohio State 666, 672. Why quote from other cases when there is so much authority on this line? *Western Union* v. *American Union*, 65 Ga. 160; Greenhood on Pub. Policy, 178; *State* v. *Standard Oil Co.*, 34 Am. St. R. 541; *People* v. *North River Sugar Co.*, 121 N. Y. 582, (18 Am. St. R. 843).

Here are two corporations licensed by the state to serve the city of Charleston, each having oil territory and appliances. The Charleston Company had been supplying the city with a main line from Boone county, with pipes ramifying through the city. Its supply is inadequate. It acquires a gas field in Roane county intending to develop gas and pipe it to its city lines. Then comes the Kanawha Company. It has a gas field in Roane and Kanawha counties. It develops and lays a line to Charleston; but though it got a franchise to do so, it had not yet laid pipes in the streets, but was about to do so. The two competing companies confront each other in competition. Then they overcome this crisis by the agreement. For what? To avoid competition. No other

purpose.   Whether that was the actual design or not is not material.   Such the tendency; such the potentiality of the arrangement; such the result.   The law looks at tendency, ability to do harm, at the result.   "The form assumed by these corporations is immaterial in determining their illegality." 20 Am. & Eng. Ency. L. (2d Ed.) 847.   Authorities above and those cited in Brannon's Fourteenth Amendment, 372, lead me to say that the statement of law there made is sound: "Thus these several corporations were combined under one ownership and control, and no longer competed with each other in the production and sale of commodities.   What the purpose of this arrangement?   Abatement or destruction of competition, limitation of production, if demand declines and prices go down, maintenance or enhancement of prices for articles necessary for public consumption; in short, control of production and prices, control of the market in given lines, and either the destruction of outstanding concerns or their compulsory amalgamation with the combination; and sometimes even with express provision to buy in the stock of other companies.   The courts declare such combinations partnerships, and held them illegal, because corporations can only separately carry out the functions assigned by the state, and cannot merge in a partnership."   Here we have two public service corporations in a partnership.   Corporations cannot form a partnership, but must act singly.   18 Am. St. R. 872. The public suffers, or may do so.

It is suggested that though some of the clauses of the agreement may be obnoxious to the vice of monopoly, yet those clauses are separable from the rest, and are not involved in this case.   They are involved.   They affect and poison the whole.   The trouble is, the whole spirit, drift, object, effect of the contract promotes monopoly.   It works a combine, an union against public policy.   As an entirety it does so.   Its warp and woof are made of monopoly.   We are as a Court asked to enforce a contract with these hurtful features and consequences inwoven in its frame.   We cannot do so consistently with law.

We affirm the decree.

*Affirmed.*