# SHAWNEE COMPRESS COMPANY *v.* ANDERSON.

## APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF OKLAHOMA.

No. 140.   Argued March 2, 3, 1908.—Decided April 13, 1908.

Where the Supreme Court of the Territory of Oklahoma reverses the judgment of the trial court, the reviewing power of this court is limited to determining whether there was evidence supporting the findings and whether the facts found were adequate to sustain the legal conclusions.

In this case, the Supreme Court of the Territory having found that a lease, being made to further an unlawful enterprise, was void as an unreasonable restraint of trade and as against public policy, this court sustains the judgment, there being proof supporting the conclusions to the effect that the lessor company agreed to go out of the field of competition, not to enter that field again, and to render every assistance to prevent others from entering it—other acts in aid of a scheme of monopoly also being proved.

It is not necessary to determine whether the Supreme Court of the Territory based its judgment holding such a lease void, on the common law, on the Sherman law, or on the statutes of the Territory; the restraint placed upon the lessor was greater than the protection of the lessee required.

17 Oklahoma, 231, affirmed.

THIS suit was brought in the District Court of the county of Lincoln, Territory of Oklahoma, by appellees as stockholders of the Shawnee Compress Company against appellants, to cancel a lease made by the Shawnee Compress Company to the Gulf Compress Company.

The original petition alleged that the compress companies were respectively corporations of Oklahoma and the State of Alabama; that the plaintiffs, appellees here, were minority stockholders of the Shawnee Company; that certain of the stockholders of the Shawnee Company, claiming to be its officers, "conceived the idea of leasing the entire property and business of said company, together with its good will and the right to the business thereof to said defendant, Gulf Compress Company, a foreign corporation;" that subsequently the

same stockholders, claiming to be the directors of the corporation in certain meetings and by certain resolutions, executed the purpose. These meetings were alleged to be invalid as not being in conformity with the by-laws, and that the proceedings therein were "wholly illegal and beyond the powers and authority of the said stockholders and directors of said corporation;" that the corporation was organized to construct and operate a cotton compress in the city of Shawnee, and that its officers and stockholders were not authorized to execute a lease for a period of years, vesting in another and foreign corporation, the rights, duties and business of the company, and that the lease was void as against the rights of plaintiffs, being minority stockholders of the company. A copy of the lease was attached to the petition.

The petition was amended, making the allegations somewhat fuller, and alleged that appellants Stubbs and Beatty, who assumed to act respectively as president and secretary of the company, and certain other stockholders who joined with them in the negotiation of the lease, were induced thereto by certain advantages personal to themselves and not by the interest of the company. It was also alleged that the "exigencies of the business" of the company did not demand or justify the lease, and that its revenues for the season 1904–1905, over and above taxes and insurance, notwithstanding negligent and incompetent management, were $7,485.89; and, plaintiffs expressed the belief, could be made greater for the years covered by the lease. It was alleged that the Gulf Compress Company was in the business of leasing and operating competing compresses for the purpose of monopolizing, as far as possible, the business of compressing cotton in a large portion, if not all, of the cotton-raising districts of the United States, and that the lease was procured from the Shawnee Company in pursuance of said scheme, and other leases of other compresses were also secured for like purposes, and that the Gulf Company is in its operation and method of conducting business a trust, combine and conspiracy, in restraint of trade

and commerce, in· violation of the Federal anti-trust law and the anti-trust law of the Territory of Oklahoma, and that it is the design of the Gulf Compress Company to increase the charge of compressing cotton, and that it will be able to enforce such charges by reason of the fact that it will control all of the compresses in the Territory.

There was a demurrer to the petition, which was overruled. An answer was then filed, which in detail asserted the validity of the proceedings preceding the execution of the lease; that the company was indebted in the sum of $17,250—$6,000 to the Shawnee National Bank and $11,250 to the Webb Press Company, Limited, which was past due; that its creditors were pressing for payment, and that the lease was necessary in order to procure money by which to pay the Shawnee Bank and to secure the extension of time on the indebtedness due the Webb Press Company, and that for these reasons the negotiations for the lease were entered into and the lease finally made. And it is alleged that the consideration paid was fair and reasonable and for the best interest of the stockholders of the Shawnee Company; that defendants could procure said second mortgage money in no other way, and that the property of the Shawnee Company would have been sold at a great sacrifice unless the lease had been made.

It is alleged that appellees are firms of cotton buyers, and in order to obtain an unfair advantage over other buyers have conspired together for the purpose of forming a monopoly of all the compresses in the Territory and destroying competition in compressing, and, in order to carry out the conspiracy, have, for more than six months, endeavored to obtain a majority of the stock of the Shawnee Company, and, knowing that Beatty and Stubbs were involved and in need of money, have in all ways oppressed said Beatty and Stubbs to compel them to sell their stock to appellants for an inadequate consideration and conspired to compel the Shawnee Company, knowing it was involved and its demands pressing, to sell and convey its property to them for the inadequate consideration of $25,000.

And it is alleged that the lease was made to defeat such conspiracy. Other plans of the appellees to harass the Shawnee Company are averred.

The case went to trial on the issues thus formed and resulted in a judgment for defendants (appellants here). The judgment recited that "the court having heard all the evidence offered . . . and being fully advised in the premises finds for the defendants and against the plaintiffs that the allegations of the petition of the plaintiffs are not supported by the law and the evidence."

A motion for a new trial was denied and the case was then taken to the Supreme Court of the Territory, which court reversed the judgment of the court below, and the case was remanded to the District Court, with instructions to that court to render judgment for plaintiffs in the case (appellees here) in accordance with the opinion of the Supreme Court, and the prayer of the amended petition.

*Mr. B. B. Blakeney*, with whom *Mr. G. T. Fitzhugh* was on the brief, for appellants:

An act is not necessarily invalid because in restraint of trade, when the restriction of trade is an ancillary or incidental result.

To be condemned by the law a contract must be an agreement between the parties to restrict trade, and such contract is invalid, whatever may be the result of its operation. If a purchaser buys one or more compresses and operates them as his own property, competition is to that extent restricted, but being incidental, such contract is not invalid, and will not be held invalid because the purchaser may have taken a contract from the seller obligating the seller not to carry on or resume such business. Such provisions are usual and have been sanctioned by the courts. *Fowle et al.* v. *Park et al.*, 131 U. S. 88; *Gibbs* v. *Gas Co.*, 130 U. S. 396; *Cin., P. B. S. & P. P. Co.* v. *Bay et al.*, 200 U. S. 179; *United States* v. *Joint Traffic Association*, 171 U. S. 505; *Bement & Sons* v. *National Harrow Co.*,

186 U. S. 70, 92; *Navigation Company* v. *Windsor*, 20 Wall. 64, 68; *Diamond Match Co.* v. *Roeber*, 106 N. Y. 473; *Tode* v. *Gross*, 127 N. Y. 480; *Beal* v. *Chase*, 31 Michigan, 490; *Hubbard* v. *Miller*, 27 Michigan, 15; *National Ben. Co.* v. *Union Hospital Co.*, 45 Minnesota, 272; *Whitney* v. *Slayton*, 40 Maine, 224; *Pierce* v. *Fuller*, 8 Massachusetts, 222; *Richards* v. *Seating Co.*, 87 Wisconsin, 503; *National Enameling & Co.* v. *Haveman*, 120 Fed. Rep. 415; *United States* v. *Addyston P. & S. Co.*, 29 C. C. A. 141; *S. C.*, 85 Fed. Rep. 271; *Davis* v. *Booth*, 131 Fed. Rep. 31, 37; *S. C.*, 127 Fed. Rep. 871; *In re Greene*, 52 Fed. Rep. 104; *Chicago, St. L. &c. Ry. Co.* v. *Pullman*, 139 U. S. 79; *Jarvis et al.* v. *Knapp*, 121 Fed. Rep. 39; *Booth et al.* v. *Davis*, 127 Fed. Rep. 871, and cases cited; *Carter* v. *Alling*, 43 Fed. Rep. 208; *Harrison* v. *Refining Co.*, 116 Fed. Rep. 304; *State* v. *Shippers Compress &c. Co.*, 95 Texas, 603; *S. C.*, 69 S. W. Rep. 58.

The statutes of Oklahoma expressly authorize a contract of this character. Wilson's Revised and Annotated Statutes of Oklahoma, §§ 819, 820.

Both of these statutes were adopted from the statutes of California and have been frequently construed by the Supreme Court of that State. *Brown* v *Kling*, 101 California, 295; *Gregory* v. *Speiker*, 110 California, 150; *Ragsdale* v. *Nagle*, 106 California, 332; *City Carpet Beating &c. Works* v. *Jones*, 102 California, 506; *Vulcan Powder Company* v. *Hercules Powder Company*, 96 California, 510.

Under these sections of the statute one who leases a compress and its good will may enter into a contract to refrain from carrying on a similar business within a specified county. The contract of lease in controversy limits such competition to fifty miles.

The evidence did not disclose whether a radius of fifty miles would have carried it without the boundaries of the county or not, but if fifty miles was an excessive restriction, the excess only was invalid and the restriction might be enforced within the limits of the law.

Such a contract being valid could not serve as a basis for concluding that it would be against public policy by creating an unnecessary restraint of trade, preventing competition and creating a monopoly.

The court below overlooked a well recognized principle which would control in any event in the disposition of this case. If the Gulf Compress Company itself was a monopoly, the Shawnee Compress Company could not for that reason prevent the specific performance of a contract for sale or lease, and, *a priori*, the minority stockholders could not interpose to prevent such performance. *Trenton Pottery Co.* v. *Olyphant,* 51 N. J. E. 507; *Diamond Match Co.* v. *Roeber,* 106 N. Y. 473; *Metcalf* v. *American School Furniture Co.,* 122 Fed. Rep. 115–120; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 547; *Willoughby* v. *Chicago Junction Ry. Co.,* 50 N. J. 656.

*Mr. James R. Keaton* and *Mr. Andrew Wilson,* with whom *Mr. John W. Shartel, Mr. Frank Wells* and *Mr. Noel W. Barksdale* were on the brief, for appellees:

The contract of lease from the Shawnee Compress Company to the Gulf Compress Company, of April 26, 1905, tended to create a combination unreasonably in restraint of trade, the prevention of competition and the establishment of a monopoly, therefore being against public policy. 26 Stat. at Large, 209, c. 647, § 3; Wilson's Statutes of Oklahoma, §§ 819, 820. The contract is illegal under the common law, also, which declares all contracts in unreasonable restraint of trade to be contrary to public policy and void.

Under the act of Congress above referred to not only contracts in unreasonable restraint of trade, but every contract in restraint of trade is condemned. See *Pocahontas Coke Co.* v. *Powhatan Coal &c. Co.,* 60 W. Va. 508; *S. C.,* 56 S. E. Rep. 264; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211.

In view of the evidence, it certainly cannot be said that any portion of the lease would unquestionably have been entered into regardless of the provisions for illegal restraint and hence

the entire contract must fall. Okla. Stat. 1893, § 810; Wilson's Ann. Stat. § 767; *Bishop* v. *Palmer*, 146 Massachusetts, 469; *Western Wooden-Ware Assn.* v. *Starkey*, 84 Michigan, 76; *Saratoga Co. Bank* v. *King*, 44 N. Y. 87; *Consumers' Oil Co.* v. *Nunnemaker*, 142 Indiana, 560; *More* v. *Bonnet*, 40 California, 251; *Frost* v. *More*, 40 California, 347.

A contract based upon several considerations, one of which is unlawful, is void. *Edwards Co.* v. *Jennings*, 89 Texas, 618; *Gage* v. *Fisher*, 5 N. D. 297; *Collins* v. *Merrell.* (Ky.), 2 Met. 163; *St. L. J. & Co. R. R. Co.* v. *Mathers*, 104 Illinois, 257.

Furthermore, these provisions, in connection with the undisputed testimony to the effect that one of his purposes in procuring the execution of said lease on behalf of the Gulf Compress Company was to prevent unreasonable or unnecessary competition, renders the entire lease contract void, under § 3 of the Sherman law which applies to trade and commerce within the Territories as well as to interstate commerce. *Northern Securities Co.* v. *United States*, 193 U. S. 196; *Western Wooden-Ware Association* v. *Starkey*, 84 Michigan, 76; *Santa Clara Val. M. & L. Co.* v. *Hayes*, 76 California, 387; *Pacific Factor Co.* v. *Adler*, 90 California, 110; *Anheuser-Busch* v. *Houck*, 88 Texas, 184; *State* v. *Distilling Co.*, 29 Nebraska, 700.

MR. JUSTICE MCKENNA, after making the foregoing statement, delivered the opinion of the court. ·

The Supreme Court of the Territory, in its opinion, discussed only two of the questions urged upon its consideration, to wit (1) the legal power of the Shawnee Compress Company to execute the lease; and (2) the purpose in its execution to secure a monopoly of the business of compressing cotton and to unlawfully restrict competition. Of the first the court said: "We find no express authority to lease set out in the articles of incorporation, but we are nevertheless of the opinion the weight of authority is that when a strictly private corporation finds it cannot profitably continue operations it may lawfully make a lease of its entire property for a term of years."

The court cited cases, and continued (p. 238): "It is only when such exigencies exist as necessitate or render appropriate such or similar action that the right can be exercised." And it was observed that while there was no special finding of fact "in that regard by the trial court, yet this feature must necessarily have been considered, in the light of the evidence introduced at the trial, and the judgment based thereon."

The court further said that it found "ample authority in the record for that action" and, following the rule "often reiterated," the court further said, "it must hold that where the record contains some evidence to support the finding of the trial court," the judgment will not be disturbed.

The ruling sustaining the power of the Shawnee Company to execute the lease is attacked by appellees, but we do not find it necessary to express an opinion upon it, on account of the view we entertain of the second proposition.

In passing on the second proposition the Supreme Court decided adversely to the view taken by the trial court. The court therefore must either have considered that there was not some evidence supporting the conclusions of fact of the trial court or must have deemed the principles of law which the trial court upheld were not sustained by its conclusion of fact. As our review, in the nature of things, is confined to determining whether the court below erred, it follows that our reviewing power under the circumstances is coincident with the authority to review possessed by the court below, and therefore we are confined, as was the court below, to determining whether there was some evidence supporting the findings and whether the facts found were adequate to sustain the legal conclusions. *Southern Pine Lumber Co.* v. *Ward,* 208 U. S. 126.

The court, in its opinion, gives a summary of the pleadings and states the salient points of the lease to be that it conveys all of the property of the Shawnee Company to the Gulf Company, that the Shawnee Company covenants that it will not "directly or indirectly engage in the compressing of cotton

within fifty miles of any plant operated by the" Gulf Company, and that the Shawnee Company "agrees and pledges" to the Gulf Company "its good will, moral and legal support, and that it, individually and collectively, will render the 'Gulf Company' every assistance in discouraging unreasonable and unnecessary competition." And from the evidence the court deduces the following conclusions. (p. 236):

"It further appears from the evidence at the trial that C. C. Hanson is the president of both the Atlanta Compress Company and the Gulf Compress Company, being a stockholder in each, and is the one who negotiated the lease in question. That the Atlanta Compress Company operates in the States of Alabama, Georgia and Florida, and was organized and is owned and controlled solely by the carriers for their benefit. That the board of directors and stockholders of said corporation are composed entirely of railroad officials. That the Atlanta Company controls the operation of twenty-five plants. That the Gulf Compress Company is a close corporation, chartered in Mobile, Alabama, and operating in the States of Alabama, Mississippi, Tennessee, Louisiana, Arkansas, Indian Territory and Oklahoma, and controlling the operation of twenty-seven compresses in those States, located at various points therein. That none of the Gulf Company's plants and the Atlanta Company's compresses are operated at the same points.

"It is further disclosed by the evidence that the capital stock of the Gulf Company, as originally incorporated, was $25,000.00, but that it has, within the past year, been increased to one million dollars, of which $600,000.00 is treasury stock. That its field of operation has been rapidly extended from Alabama to all the cotton-growing territory; that it is at the present time engaged in the purchase or leasing of compresses at various points, and, as testified to by its president, is 'prepared to buy or lease, whichever proposition suits us best.' It appears from the evidence that negotiations conducted by Mr. Hanson with Stubbs and Beatty for the lease of the Shaw-

nee plant were in pursuance of an effort to avoid, 'directly or
indirectly, the possibility, if not probability, of unnecessary
and unreasonable competition.'

"It is further disclosed by the testimony that the carrier
pays for the compression of cotton, incorporating the cost
thereof in its tariff. That tariffs for the hauling of cotton are
established by the railroads as well as hauling districts or
territories, within which the haul of cotton must be one way,
or otherwise the higher rate, denominated the terminal rate,
applies, rendering it unprofitable to ship to other than the
established point in the hauling district."

And the court says that from these facts, and others referred
to supporting them, it cannot be doubted that the object of
the Gulf Company and its allied corporation, the Atlanta
Compress Company, "is to prevent competition in compres-
sion of cotton throughout the cotton-producing States." The
court declared it to be its judgment that "not only is the enter-
prise in which the Gulf Compress Company is engaged an un-
lawful one, as now conducted, but the contract in question
in this case, being made to further its objects and purposes,
is void on the ground that it is in unreasonable restraint of
trade and against public policy."

This conclusion is the direct antithesis of that drawn by
the trial court and we are brought to the inquiry, is it justified?

The evidence cannot be given in detail, and we may say at
the outset that there is no question as to its weight—we are
not confronted with conflicting testimonies. This branch of
the case is constituted of the lease, principally of the testimony
of one witness, the president of the Gulf Company, and of
facts which are not disputed. The other testimony, a great
deal of which is documentary, is mostly directed to the finan-
cial condition of the Shawnee Company as the inducement
of the lease and to the proceedings taken to authorize its ex-
ecution. There is also testimony directed against the purpose
and motives of the appellees, and some tending to show that
one of the officers and stockholders of the Shawnee Company

had been loaned money by the president of the Gulf Company, whereby control of the Shawnee Company might be obtained and the lease authorized. This, however, we may put out of view.

It may be conceded that the evidence shows that the Shawnee Company was financially embarrassed, and its condition might have justified a lease of its property if that had been all it did. It, however, covenanted for its assistance in discouraging competition against its tenant, and bound itself not to "directly or indirectly engage in the compressing of cotton within fifty miles of any plant operated by the tenant." So far it covenanted to aid in the restraint of trade. It went out of the field of competition; it covenanted not to enter into that field again, and .it pledged itself to render every assistance to prevent others from entering it. And it could not misunderstand the purpose for which its lease was solicited. It was told by the president of the Gulf Compress Company. In a letter dated April 18, 1905, addressed to it by the president of that company, among other inducements, the following was expressed: "Our getting together on a lease proposed means the avoiding for each other, directly or indirectly, of the possibility, if not probability, of unnecessary competition." And what was the condition to which the Shawnee Company contributed? It appears from the letter just mentioned that the writer was president of two companies, which operated "forty odd compresses." Twenty-seven of them, it appears from the testimony, were operated by the Gulf Company, six only of which it owned. Most of the latter were acquired in the summer preceding the lease, and the president of the Gulf Company testified that "we are prepared to buy or lease, whichever proposition suits us best." To what object was the assembling in one ownership or management so many compresses, and keeping the means and declaring the purpose of acquiring more? The answer would seem to be obvious. The first effect would necessarily be the cessation of competition. If there was left a possibility of other compresses being con-

structed, it was made less by the power that could be opposed to them. The Gulf Company was a close corporation, which, starting in Alabama, rapidly extended from Alabama to all the cotton-growing territory. These are some of the points of the testimony which, taken in connection with other testimony, and with the terms of the lease and the restriction upon the Shawnee Company, support the conclusions of the Supreme Court of the Territory. This case presents something more than the lease of property by the Shawnee Company, induced or made necessary by financial embarrassment. It presents something more than the .acquisition by the Gulf Company of another compress—of a mere addition to its business. It presents acts in aid of a scheme of monopoly. *Swift Co.* v. *United States,* 196 U. S. 375.

It does not appear whether the Supreme Court based its judgment upon the common law, the Sherman law, act of July 2, 1890, c. 647, 26 Stat. 209, or the statutes of Oklahoma. The appellees insist that the law applicable to the case comes from all three sources. The Sherman law provides that, "Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any territory of the United States or of the District of Columbia . . . is hereby declared illegal." And it has been decided that not only unreasonable but all direct restraints of trade are prohibited, the law being thereby distinguished from the common law. But it is contended that it was held in *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, and in *United States* v. *Joint Traffic Association,* 171 U. S. 505, that the sale of the good will of a business with an accompanying agreement not to engage in a similar business was not a restraint of trade within the meaning of the Sherman act.

Counsel has discussed with an affluent citation of cases the principle which regulates such contracts, and insists that the lease by the Shawnee Company conforms to such principle. The principle is well understood. The restraint upon one of the parties must not be greater than protection to the other

party requires, and it needs no further explanation than is given in *Gibbs* v. *Baltimore Gas Company*, 130 U. S. 396. The Supreme Court of the Territory recognized the principle, but said: "Tested by the general principles applicable to contracts of this character, this agreement is far more extensive in its, outlook and more onerous in its intention than is necessary to afford a fair protection to the lessee." And in this conclusion the statute of the Territory may have had its influence. That statute makes void every contract by which any one is restrained from exercising a lawful profession, trade or business, except, however, that one who sells the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city or part thereof. Wilson's Statutes, §§ 819, 820. It is clear that the lease of the Shawnee Company to the Gulf Company does not literally comply with this requirement. Whether it can be limited by construction, as it is contended by appellants it can be, we need not decide. As written, it was, no doubt, considered with other considerations by the court in concluding that "the real, the veritable purpose actuating the officers of the Gulf Compress Company, as disclosed by its plan of operation, and as manifested by the circumstances surrounding the conduct of its business and the results of its management by them is, beyond a reasonable question, to place within their power the control of the compress industry, by purchasing or leasing those plants which are advantageously located in each of the hauling districts or territories established by the carriers (railroads) in their cotton tariffs. Within certain boundaries the hauling must be one way, and when the Gulf Company seizes the strategic point, under its lease, competition within that district is annihilated."

*Decree affirmed.*