## HARDING GLASS CO. v. TWIN CITY PIPE LINE CO. et al. *

### No. 8686.

Circuit Court of Appeals, Eighth Circuit.
March 8, 1930.

Joseph R. Brown and James B. McDonough, both of Ft. Smith, Ark., for appellant.

Harry P. Daily, of Ft. Smith, Ark. (Vincent M. Miles and John P. Woods, both of Ft. Smith, Ark., on the brief), for appellees.

Before VAN VALKENBURGH and GARDNER, Circuit Judges, and MUNGER, District Judge.

MUNGER, District Judge.

The Twin City Pipe Line Company brought suit to compel the Harding Glass Company to perform a contract, and obtained a decree. The glass company has appealed.

*Rehearing denied June 26, 1930.

The principal question involved is whether the contract is so illegal that the court will not aid in its enforcement. The glass company has a factory at Ft. Smith, Ark., and uses a large amount of gas in the manufacture of its products. The pipe line company is a public utility corporation which supplies gas from natural gas fields to Ft. Smith, where it sells the gas to industries, and to a company which supplies domestic consumers. Litigation had occurred between the glass company and the pipe line company and others over contracts for the supply of gas to the glass company. A compromise was reached, and a contract was made dismissing the pending legal proceedings, and providing that the pipe line company should lay a larger pipe to supply the glass company, and in this contract were the following provisions:

"The Harding Glass Company agrees to take all its requirements of gas for its plants in the City of Ft. Smith, Arkansas, from the Twin City Pipe Line Company so long as the Twin City Pipe Line Company can adequately supply its requirements and to pay for all gas furnished it hereunder, beginning September 1, 1926, at the regular sliding schedule of rates of twelve cents to fifteen cents, which is the rate now in effect for industries in the City of Fort Smith, Arkansas, or at such rate as may hereafter be fixed for industries in the City of Fort Smith by the proper regulatory body or Court having jurisdiction. All gas consumed by the Harding Glass Company up to September 1, 1926, shall be paid for at the rate of ten cents per thousand cubic feet.

"The Harding Glass Company agrees that in the event there is a shortage of gas so that there is not enough to adequately supply the domestic consumer, that the Twin City Pipe Line Company may discontinue serving it gas, upon condition that the same character of service be given the Harding Glass Company that is given other industries in the City of Fort Smith, Arkansas, and that his gas service be not discontinued unless that of other like industries is discontinued also."

The glass company thereafter took its requirements of gas from the supply furnished by the pipe line company for several years, but it then made preparations to take its supply of gas from another corporation which had a franchise permitting it to lay a pipe line to the factory of the glass company. Upon proof of these facts, a decree was entered ordering the glass company to take all of its requirements of natural gas from the pipe line company so long as it could adequately supply its needs, and to specifically perform the contract. The decree also enjoined the glass company from taking any of its requirements of gas from any other person or company so long as the pipe line company could adequately supply its needs.

Appellant glass company asserts that the portion of the contract which requires it to take all of its requirements of gas exclusively from the pipe line company is illegal and contrary to public policy, because it is in restraint of trade, tends to the monopolization at Ft. Smith of the sale of gas by the pipe line company, and is an undue restraint of business competition between companies supplying gas. It is to be observed that the contract obligates the glass company to take the gas without any limit of time, unless one of the conditions of the contract arises. It appears that the glass company is the largest consumer of gas among the industries of Ft. Smith. The public policy to be ascertained is the public policy of Arkansas. Northwestern Mut. Life Ins. Co. v. Johnson, 254 U. S. 96, 100, 41 S. Ct. 47, 65 L. Ed. 155; Whitfield v. Ætna Life Ins. Co., 205 U. S. 489, 495, 27 S. Ct. 578, 51 L. Ed. 895; McCue v. Northwestern Mut. Life Ins. Co. (C. C. A.) 167 F. 435, 442. It is only in clear cases that a contract will be declared illegal because of public policy. Steele v. Drummond, 275 U. S. 199, 205, 48 S. Ct. 53, 72 L. Ed. 238. The character and tendency of the contract is to be considered, rather than the good intentions of the parties, or the absence of actual injury. McMullen v. Hoffman, 174 U. S. 639, 647, 19 S. Ct. 839, 43 L. Ed. 1117; Greenhood on Public Policy 5; Gibbs v. Smith, 115 Mass. 592, 593; United States v. E. C. Knight Co., 156 U. S. 1, 16, 15 S. Ct. 249, 39 L. Ed. 325; Weil v. Neary, 278 U. S. 160, 173, 49 S. Ct. 144, 73 L. Ed. 243. The Constitution of Arkansas (article 2, § 19) contains this provision: "Perpetuities and monopolies are contrary to the genius of a republic, and shall not be allowed." No specific determination is found in the statutes or decisions of the Supreme Court of Arkansas applicable to the exact situation. That court has decided many questions involving alleged restraints of trade (see Woodruff v. Berry, 40 Ark. 251; Webster v. Williams, 62 Ark. 101, 34 S. W. 537; Shapard v. Lesser, 127 Ark. 590, 193 S. W. 262, 3 A. L. R. 247; Wakenight v. Spear & Rogers, 147 Ark. 342, 227 S. W. 419) in recognition of the common-law principles applicable. It is apparent from the record in

this case that there were several companies which had authority to sell gas to the appellant. It is conceivable that other companies may come into existence able to supply the appellant's needs. One such company is ready to sell appellant its requirements. Is the contract valid by which the glass company agreed to buy exclusively from the pipe line company, so long as it could supply its needs? In Coombs v. Burk, 40 Cal. App. 8, 10, 180 P. 59, the question was presented of the validity of a contract whereby a customer of a gas company agreed to purchase all the gas which he might use. In that case the court said:

" 'Whatever tends to prevent competition in business impressed with a public character is opposed to public policy and is therefore unlawful.' Greenhood on Public Policy, p. 180.

"Where a contract affects such character of business, since no restraint, however partial, can be tolerated, the court will not inquire into or consider the extent of the restriction imposed. Gibbs v. Consolidated Gas Co., 130 U. S. 396, 9 S. Ct. 553, 32 L. Ed. 979; West Va. T. Co. v. Ohio R. P. L. Co., 22 W. Va. 600, 46 Am. Rep. 527; Gwynn v. Telephone Co., 69 S. C. 434, 48 S. E. 460, 67 L. R. A. 111, 104 Am. St. Rep. 819; [Central Ohio] Salt Co. v. Guthrie, 35 Ohio St. 672. As to private business, the conduct of which does not affect the public welfare, and hence involves no question of public policy, a different rule applies, under which contracts, if reasonable in their terms, will be enforced.

"Concededly in the instant case the Gas Corporation was engaged in a business impressed with a public character (Gibbs v. Cons. Gas Co., supra), and from a reading of the contract it is apparent that its purpose in making the same was to prevent defendant from discontinuing the use of gas furnished by it, and, in lieu thereof, obtaining a supply from another company engaged in supplying gas to the inhabitants of the city. That the contract was not only in restraint of trade, but if upheld would tend to stifle competition and give plaintiff's assignor a monopoly of the business of furnishing a supply of gas in the city, and hence be detrimental to the public welfare, admits of no controversy."

In People ex rel. Perceval v. Public Service Commission, 163 App. Div. 705, 707, 148 N. Y. S. 583, 585, a public utility company supplying electric current required of those who sought to become its customers an agreement that they should take no electric current from any other company. In awarding a writ compelling the company to supply the needs of an applicant for service, although he also proposed to take electric current at the same place from another company, the court said:

"It is, of course, the rule that such a corporation may establish reasonable regulations respecting the use of the service which it proposes to furnish, and each customer requiring the service is called upon to comply with such regulations. In our opinion, however, the requirement that a consumer must take all of its electricity from one company, or receive none at all, is not in any proper sense a regulation respecting the use of the service, but is a purely arbitrary attempt on the part of the company to insure to itself a monopoly of furnishing electrical current. If the company can lawfully decline to furnish any current to this relator because he also proposes to obtain electricity from a neighbor (not a competing company), it can equally well refuse * * * electrical current to a consumer who himself generates a part of the current which he uses. Such a limitation upon the company's obligation would, as it seems to us, be quite unreasonable. An exclusive clause similar in purport and intention to the one insisted upon by the defendant company was severely condemned upon grounds of public policy in Central New York Tel. & Tel. Co. v. Averill, [199 N. Y. 128, 92 N. E. 206, 32 L. R. A. (N. S.) 494, 139 Am. St. Rep. 878]. * * * To sum up our conclusion, we are of opinion that the company's reasons for refusing to furnish electrical current to the relator are untenable, and that the restrictive clause which it insists in inserting in its contracts, and to which relator objects, is contrary to public policy and invalid and constitutes in no proper sense a reasonable regulation respecting the use of the service which relator demands."

In Central New York Telephone & Telegraph Co. v. Averill, 199 N. Y. 128, 139, 92 N. E. 206, 209, 32 L. R. A. (N. S.) 494, 139 Am. St. Rep. 878, referred to by the court in the last case cited, an agreement had been made by the proprietors of a hotel with a telephone company, by the terms of which it was provided that no other telephone instruments or wires should be maintained in the hotel. In holding that the contract was invalid the court said:

"If a telephone company may contract for the exclusion of any other telephone service

from the premises of its customers, it may thus deprive all those customers of telephone communication with every person who takes telephone service from rival concerns, and thus prevent just what all telephone franchises are designed to promote—that is, the availability to every member of the community who desires it, and can afford to pay for it, of the most extensive telephone service attainable."

In United States Telephone Co. v. Central Union Telephone Co. (C. C. A.) 202 F. 66, 71, the court considered a contract between a local telephone company and a long-distance telephone company by which the local company agreed to permit no other long distance company to connect with its lines for 99 years. This portion of the contract was held to be against public policy, the court making the observation:

The long-distance company not only forestalls competition likely to arise through the extension of the local company's lines, but by its system of these contracts there was a direct plan and effort to monopolize in the long-distance business so much of the field as it could recover. A general system of contracts may be obnoxious to an anti-trust law, though the individual contract would not be. United States v. Reading Ry., 226 U. S. 324, 33 S. Ct. 90, 57 L. Ed. 243. These contracts, therefore, must be condemned because 'adopted for and adapted to' restraint of trade and monopoly, unless they escape that condemnation for the reasons hereafter to be considered."

In Gwynn v. Citizens' Telephone Co., 69 S. C. 434, 443, 48 S. E. 460, 67 L. R. A. 111, 104 Am. St. Rep. 819, an agreement by a customer of a telephone company to install and use exclusively one of the company's phones in his place of business was held invalid, because its tendency was to stifle competition between common carriers and to create a monopoly. Contracts between public utility corporations, by which it was agreed that the territory in which they should do business should be divided between them, or that one should not sell to a customer of the other, have been held contrary to public policy because tending to monopolize the business and to suppress competition. Chicago Gas-Light & Coke Co. v. People's Gas-Light & Coke Co., 121 Ill. 530, 545, 13 N. E. 169, 2 Am. St. Rep. 124; Charleston Gas Co. v. Kanawha Gas L. & F. Co., 58 W. Va. 22, 25, 50 S. E. 876, 112 Am. St. Rep. 936, 6 Ann. Cas. 154; State v. Portland Natural Gas & Oil Co., 153 Ind. 483, 489, 53 N. E.

1089, 53 L. R. A. 413, 74 Am. St. Rep. 314; City of Detroit v. Mutual Gaslight Co., 43 Mich. 594, 606, 5 N. W. 1039; 1 Wyman on Public Service Corporations, § 693. It is obvious that such companies may divide the field just as effectually, if they may obtain enough exclusive and long-enduring contracts from groups of customers, and, in addition, may make the field barren for future competitors.

Somewhat opposed to the line of reasoning presented by the foregoing cases is the case of Bald Eagle Val. R. Co. v. Nittany Val. R. Co., 171 Pa. 284, 299, 33 A. 239, 243, 29 L. R. A. 423, 50 Am. St. Rep. 807. A contract between a railway company and an iron company by which the railway company agreed to contribute money to the iron company to develop its ore land, and the iron company agreed to give all its traffic to the railway company, was held valid. The court said:

"Is a contract by a railroad company with an iron company, in which the former contributes a large sum of money to the latter for development, and gives to it facilities for transportation, in consideration of which the iron company contracts to give it all its traffic, ultra vires? It is not in restraint of trade, for its express purpose and necessary effect are to increase both trade and population. Not a single traveler or shipper outside the contracting party is affected in his selection of a route. The contract binds none of them. It is not seldom that those who have reaped benefits from a contract such as this seek to escape its obligations by taking refuge in that assumed turpitude which, on grounds of public policy, avoids the contract; but here—and it is a gratification to us to say it—the parties to this contract violated no law, restrained not others from engaging in business, did nothing of evil example or detrimental to public morals; therefore, there is no public policy which, in the absence of express legislative enactment, makes void this contract."

This decision may be accepted as stating the public policy of Pennsylvania.

The ordinary rule that a contract is not against public policy, although one of the parties agrees thereby to deal exclusively with the other (Carter-Crume Co. v. Peurrung [C. C. A.] 86 F. 439, 440, 13 Corp. Jur. 486), does not necessarily apply in the case of those engaged in a public business, such as supplying gas for public use. A contract by such persons may be invalid, even though the restraint of trade is only partial, if it is

injurious to the public by tending to prevent competition, or by tending to create a monopoly. Gibbs v. Consolidated Gas Co. of Baltimore, 130 U. S. 396, 408, 9 S. Ct. 553, 32 L. Ed. 979; Union Trust & Savings Bank v. Kinloch Long-Distance Tel. Co., 258 Ill. 202, 101 N. E. 535, 45 L. R. A. (N. S.) 465, Ann. Cas. 1914B, 258; Central New York Tel. & Tel. Co. v. Averill, supra; West Virginia Transportation Co. v. Pipe Line Co., 22 W. Va. 600, 625, 46 Am. Rep. 527; Chicago Gas-Light & Coke Co. v. People's Gas-Light & Coke Co., supra; Greenhood on Public Policy, 180; Joyce on Monopolies, § 92; Pond on Public Utilities, §§ 205, 207; 13 Corp. Jur. 478; 41 Corp. Jur. 153, 157, 160, 161; 3 Williston on Contracts, § 1645.

The monopolization that is condemned is that understood in the modern definition of monopoly, a condition produced by agreements or by acts of individuals, so that a power may exist to control prices or to exclude competition. National Cotton Oil Co. v. Texas, 197 U. S. 115, 129, 25 S. Ct. 379, 49 L. Ed. 689; Standard Oil Co. v. United States, 221 U. S. 1, 57, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; 41 Corp. Jur. 82; 19 Rul. Cas. Law, 30. See, also, Shawnee Compress Co. v. Anderson, 209 U. S. 423, 435, 28 S. Ct. 572, 52 L. Ed. 865. "The logical effect of all monopolies is an increase of price of the thing produced." Pearsall v. Great Northern Railway Co., 161 U. S. 646, 676, 16 S. Ct. 705, 40 L. Ed. 838.

A dominant question to be considered in each case is whether the contract involved is injurious to the public interest, and each case must be judged by its own circumstances. Considering the very large amount of gas contracted to be sold to the Harding Glass Company, the extended time during which the contract was to be in force, the natural effect of the contract upon competition in furnishing gas service in the locality, the conclusion has been reached that the portion of the contract requiring the Harding Glass Company to buy gas exclusively from the pipe line company must be held to be invalid, as tending to stifle legitimate competition in supplying the needs of consumers of gas in the field of operations of the pipe line company. The aid of the courts will not be granted to enforce such contracts. Oscanyan v. Arms Co., 103 U. S. 261, 267, 26 L. Ed. 539; Gibbs v. Consolidated Gas Co. of Baltimore, 130 U. S. 396, 412, 9 S. Ct. 553, 32 L. Ed. 979; Continental Wall Paper Co. v.

Louis Voight & Sons Co., 212 U. S. 227, 262, 29 S. Ct. 280, 53 L. Ed. 486. The decree will be reversed, with directions that the plaintiff's bill be dismissed.