UNITED STATES v. PATTERSON et al.

(District Court, S. D. Ohio, W. D.   June 26, 1912.)

No. 862.

**1. MONOPOLIES (§ 10\*)—SHERMAN ANTI-TRUST ACT—CONSTITUTIONALITY.**

The Sherman Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), making it a criminal offense to make any contract or engage in any combination or conspiracy in restraint of interstate trade or commerce, or to monopolize or attempt to monopolize or conspire with any other person or persons to monopolize any part of such trade or commerce, is a valid criminal statute, sufficiently clear in itself to inform the accused of the nature and cause of the accusation against him, and criminal prosecutions under it do not deprive the defendants of liberty or property without due process of law.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 9; Dec. Dig. §·10.\*]

**2. MONOPOLIES (§ 31\*)—SHERMAN ANTI-TRUST ACT—INDICTMENT FOR VIOLATION.**

If an indictment under the Sherman Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), charges acts on the part of defendants which are in fact and necessarily in restraint of interstate trade and commerce, or effect a monopoly of some part of such commerce, by wrongfully injuring or destroying the business of competitors, defendants are presumed to have intended such consequences, and to have known that their acts were in violation of the statute.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.\*]

**3. MONOPOLIES (§ 31\*)—SHERMAN ANTI-TRUST ACT—INDICTMENT FOR VIOLATION.**

An indictment under the Sherman Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), charging a number of defendants with a conspiracy in restraint of interstate trade and commerce, is sufficiently specific where it avers that defendants were the managing officers and agents of a corporation, who controlled the conduct of its business, and, while not naming particular instances specifically, describes the course of conduct and means used by the corporation, by which it compelled many competitors, some of whom are also named, to go out of business, or to sell their business to it.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.\*]

**4. CRIMINAL LAW (§ 1186\*)—RULES OF ADMINISTRATION—TECHNICAL DEFENSES.**

At the present time the reasons which formerly impelled courts to resort to technicalities in criminal cases to avoid the infliction of unjustly severe penalties have ceased to exist, and the effort now on the part of the judges is to overlook technicalities so far as possible, and to administer the law from a broad viewpoint, looking to ultimate justice upon the merits.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3215–3219; Dec. Dig. § 1186.\*]

**5. MONOPOLIES (§ 31\*)—SHERMAN ANTI-TRUST ACT—INDICTMENT FOR VIOLATION.**

An indictment for conspiracy in restraint of interstate commerce, in violation of the Sherman Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), charges an offense, where a general charge is made of restraint of trade in a particular article, pur-

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

suant to a conspiracy for the purpose, and specific facts are alleged, which, if true, show that defendants have restrained a part of that trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

**6.** MONOPOLIES (§ 12*)—SHERMAN ANTI-TRUST ACT—CONSPIRACY IN RESTRAINT OF TRADE.

If the purpose of a conspiracy is to restrain interstate trade, within the meaning of the Sherman Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), the degree of restraint effected thereby is immaterial to the offense.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

**7.** MONOPOLIES (§ 31*)—SHERMAN ANTI-TRUST ACT—INDICTMENT FOR CONSPIRACY IN RESTRAINT OF TRADE.

In an indictment under the Sherman Anti-Trust Act of July. 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), for conspiracy in restraint of interstate trade and commerce, it is not necessary to allege an overt act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

**8.** MONOPOLIES (§ 31*)—SHERMAN ANTI-TRUST ACT—INDICTMENT FOR "MONOPOLY."

An indictment for monopolizing a part of interstate trade and commerce, in violation of the Sherman Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), sufficiently charges such monopoly, where it alleges that pursuant to a conspiracy therefor defendants monopolized a part of the trade in a single article entering into such commerce.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*

For other definitions, see Words and Phrases, vol. 5, pp. 4570–4574.]

**9.** MONOPOLIES (§ 31*)—SHERMAN ANTI-TRUST ACT—MONOPOLY OF INTERSTATE COMMERCE.

Where defendants acquired a monopoly in a part of interstate commerce through a conspiracy for the purpose, the continuance of such monopoly after the conspiracy has accomplished its purpose and ceased to exist is in itself an offense under the Sherman Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647, § 2 [U. S. Comp. St. 1901, p. 3200]), and the conspirators are criminally liable therefor, although the business is conducted by a corporation which is controlled by them.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

**10.** INDICTMENT AND INFORMATION (§ 129*)—SHERMAN ANTI-TRUST ACT—INDICTMENT FOR VIOLATION—DUPLICITY.

In an indictment under the Sherman Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), counts for conspiracy in restraint of interstate commerce, for conspiracy to monopolize a part of such commerce, and for monopolizing a part of such commerce may be joined.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 414–418; Dec. Dig. § 129.*]

Criminal prosecution by the United States against John H. Patterson and 29 others. On demurrer to indictment. Overruled.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The following true bill of indictment against the several defendants therein named was presented February 22, 1912:

### First Count.

Southern District of Ohio, Western Division—sct.

The grand jurors for the United States of America impaneled and sworn in the District Court of the United States for the Western Division of the Southern District of Ohio at the February term thereof in the year nineteen hundred and twelve, and inquiring for that division and district, upon their oath present, that throughout the twenty years last past, inventors and manufacturers have been busy inventing, producing and putting upon the market divers record-keeping and cash-receptacle devices, usually called cash registers, each consisting generally of a box, principally of metal, but partly of wood, glass and other materials, containing a drawer or recess for the holding of coins and paper money, and a mechanism, manipulated by outside keys or similar means, for the use of employés in registering, for the information of the proprietor, upon a concealed and locked record, the sales made by employés of the business concern making use of the device, and at the same time visibly indicating the amount of each sale or the character of each transaction; the recording or registering devices being so connected with the lock of the money-drawer that when any of said devices is operated the money-drawer is unlocked and opened, so that money can be placed therein and change extracted therefrom; said money-drawer being automatically locked upon being closed, and the interior mechanism of said registering device being protected by a lock, the key of which is retained by the proprietor, from being interfered with by unauthorized persons; numerous patents having, during said twenty years, been issued to inventors, some basic and some for improvements; most of the former and many of the latter having expired long before the three-year period of time in this indictment hereafter mentioned; and the number of such patents being so great as to prevent the setting forth in this indictment of detailed descriptions of the same, or of the various inventions covered by them, even if such descriptions were known to said grand jurors:

That such cash registers have been found so useful and the demand for them has been so great that, during said twenty years, many concerns have been engaged, in the manner and under the circumstances in this indictment hereafter set forth and in competition with each other, except as hereinafter shown, in the manufacture and sale, directly and indirectly under letters patent, and otherwise, of such cash registers; and that a list of the names of such of said concerns as are known to said grand jurors, showing their respective places of manufacture, so far as known to said grand jurors, is as follows, to wit: The National Cash Register Company, a corporation, Dayton, Ohio. [Then follow names of 32 other companies.]

That of the total amount of manufacturing of such cash registers done by all of said concerns during said twenty years, said the National Cash Register Company has done from approximately eighty per cent. early in said period to approximately ninety-five per cent. at the latter end thereof.

That said concerns, during said twenty years, have also respectively sold the greater portion of the cash registers so manufactured by them, some to users of and some to dealers in such cash registers, whose several places of use and business have been situated in all the other states of the United States than those wherein such cash registers have been so manufactured by said concerns respectively, and have consigned for sale other such cash registers to such dealers, and to their own agents, in such other states; that in pursuance of such sales and upon such consignments, said concerns have respectively been continually shipping such cash registers to such users, dealers and agents in such other states; the number of such users, agents and dealers being so great, as said grand jurors, upon their said oath, charge the fact to be, as to make it impracticable, if not impossible, to set forth a list of them in this indictment; that, by reason of the great cost of such cash registers and as a means of furthering the sales thereof to users, it has been customary for said concerns and dealers to sell such cash registers to users

upon deferred payments in installments; and that in and by so manufacturing, selling, consigning and shipping such cash registers into other states than the state of manufacture, each of said concerns has been engaged in trade and commerce among the several states of the United States within the meaning of the act of Congress approved July 2, 1890, and entitled "An act to protect trade and commerce against unlawful restraints and monopolies."

And the grand jurors aforesaid, upon their oath aforesaid, do further present, that said the National Cash Register Company has had certain persons for its principal officers and agents, each of whom, from the day of his becoming such officer and agent to the day of the finding and presentation of this indictment, or, in case he has ceased to be such officer and agent, from the day of his becoming such officer and agent to the day of his ceasing to be such, has been actively engaged in the management of the business and affairs of said the National Cash Register Company, under its authority, and to the full extent of his authority as such officer and agent; and that a list of the names of such of said persons as are known to said grand jurors, showing, so far as known to said grand jurors, the character of their several offices and agencies, and the time of their becoming such officers and agents respectively, and, in case they have ceased to become such officers and agents, the time when they so ceased to become such officers and agents (Christian names unknown to said grand jurors being indicated by initials), is as follows, that is to say: John H. Patterson, President, 1892–1912. [Here follows list of many officers and agents, with dates of service, including defendants charged.]

And the grand jurors aforesaid, upon their oath aforesaid, do further present, that said John H. Patterson, Edward A. Deeds, George C. Edgeter, William F. Bippus, William H. Muzzy, William Pflum, Alfred A. Thomas, Robert Patterson, Thomas J. Watson, Joseph E. Rogers, Alexander C. Harned, Frederick S. High, Pliny Eves, Arthur A. Wentz, George E. Morgan, Charles T. Walmsley, Charles A. Snyder, Walter Cool, Myer N. Jacobs, Mont. L. Lasley, Earl B. Wilson, Jonathan B. Hayward, Alexander W. Sinclair, John J. Range and Edgar Park, alias C. D. Foote, and M. G. Keith, W. M. Cummings, J. C. Laird, W. C. Howe and E. H. Epperson, whose Christion names are to said grand jurors unknown, hereinafter referred to as defendants, being as said grand jurors, upon their said oath, here charge they have been, the persons who have, by virtue of their being such officers and agents of said the National Cash Register Company, controlled and directed the business and affairs of said the National Cash Register Company, unlawfully have, continuously and at all times from the days when, as in this count above set forth, they respectively became officers and agents of said the National Cash Register Company to the day of the finding and presentation of this indictment, or to the days when they ceased to be such officers and agents, in cases where they did so cease to be such officers and agents. at and within said Western Division of said Southern District of Ohio, knowingly engaged and consciously participated in a corrupt conspiracy in undue, unreasonable, direct and oppressive restraint of said interstate trade and commerce so as aforesaid, during such times, carried on by the several concerns in this count above named other than said the National Cash Register Company, each of said defendants then and there well knowing, as he then and there did well know, all the premises in this indictment aforesaid, that is to say, a conspiracy to restrain, and which during and throughout such times has in fact restrained, said last-mentioned trade and commerce by divers unfair, oppressive, tortious, illegal and unlawful means, and means which, consideration being given to the advantage over said other concerns held by said the National Cash Register Company in consequence of its resources being, as they were, so great as compared with those of such other concerns respectively, have unlawfully, wrongfully and irresistibly excluded others from engaging in that trade and commerce, none of which has been justified or warranted by any letters-patent, a description of which conspiracy and means is now here set forth:          /

Intending to obstruct, restrict and restrain the free flow of said interstate trade and commerce so carried on by said concerns other than said the Na-

tional Cash Register Company, and compel those concerns either to go out of business or to sell and transfer their business and their facilities and instrumentalities for carrying it on to said the National Cash Register Company, so that said the National Cash Register Company could, as in most cases it in fact did, discontinue the business and the use of the facilities and instrumentalities so acquired by it, and thereby effectually and inevitably to eliminate and prevent all competition of such other concerns with said the National Cash Register Company (all of such other concerns being hereinafter referred to as competitors), said defendants, in their several capacities as such officers and agents of said the National Cash Register Company, have, by concerted action and continuous endeavor carried on the business and affairs of said the National Cash Register Company upon a plan involving—

1. The inducing, hiring and bribing of employés and ex-employés of said competitors of said the National Cash Register Company deceitfully and wrongfully to disclose to said the National Cash Register Company the secrets of the business of the concerns by which they were respectively employed, or had been employed, particularly those relating to prospective buyers of cash registers, to customers who had ordered such cash registers, to those who had purchased but had not yet fully paid for such cash registers, to the shipment of cash registers to such customers and to agents and dealers, to the volume of business being done and the places where it' was being done by such competitors, to inventions pertaining to cash registers and to drawings, specifications, claims and applications for patents for such inventions, and to the financial condition and connections of such competitors;

2. The inducing, hiring and bribing of employés of carters, truckmen, express companies, railroad common carriers, telegraph companies and tele- phone companies, wrongfully and unlawfully to disclose to said the National Cash Register Company the secrets of the business of such carters, truckmen, express companies, railroad common carriers, telegraph companies and tele- phone companies, pertaining to the carriage and transportation of cash reg- isters for such competitors, including the number of such cash registers carted or shipped and the names and addresses of the consignees thereof, and pertaining to communications between such competitors and their agents and customers concerning the business of such competitors;

3. The instructing and requiring all sales agents of said the National Cash Register Company to ascertain and report to said the National Cash Register Company all facts and details pertaining to the business and activities of said competitors, and particularly of competitors newly coming into the com- petitive field, and the employing of agents especially so to do;

4. The using of the influence of said the National Cash Register Company and of its agents with, and the making of unwarranted and false statements to, banking and other institutions, to injure the credit of said competitors and prevent their securing accommodations of money, credit and supplies con- venient and necessary to the carrying on of their business;

5. The instructing and requiring of all sales agents of said the National Cash Register Company to interfere with, obstruct and prevent, in every way possible, sales of such competitive cash registers by said competitors, and by agents of said competitors, and by dealers in cash registers, and by any and all means to bring about sales of the cash registers of said the National Cash Register Company, and also the displacement of such competitive cash regis- ters and the substitution of the genuine cash registers of said the National Cash Register Company therefor in the hands of users of cash registers; and particularly by making to prospective purchasers of such competitive cash registers false and unwarranted statements derogatory of the same, and false, libelous and unwarranted statements reflecting injuriously upon the business character and financial credit of such competitors and upon their ability and intention to perform their undertakings and make good their war- ranties and promises with reference to the sufficiency, operation, repair and maintenance of their said competitive cash registers, and offering to sell and selling, to such prospective purchasers of cash registers from said competitors, genuine cash registers of said the National Cash Register Company at prices much less than the regular and standard prices therefor and upon unusually

favorable terms as to payments and deferred payments; by inducing, through such false, libelous and unwarranted statements and through said unusual offers, persons who had already ordered such ,competitive cash registers to cancel such orders and purchase the genuine cash registers of said the National Cash Register Company; by inducing, through such false, libelous and unwarranted statements and through such unusual offers, and through offers to make, and making, further reductions in prices of said genuine cash registers of said the National Cash Register. Company equivalent to the amounts paid towards the purchase of such competitive cash registers, persons who had purchased, but only partially paid for, such competitive cash registers to repudiate their contracts of purchase with said competitors, and refuse to pay balances due upon such competitive cash registers, and return the same to such competitors; by inducing, through such false, libelous and unwarranted statements, in some cases persons who had bought and paid for ·such competitive cash registers, and in other cases persons who had only partially paid for such cash registers, to surrender the same to said the National Cash Register Company in exchange for genuine cash registers of that company upon such basis that those persons would lose nothing on account of their having so purchased such competitive cash registers, for the purpose of exhibiting, and thereupon actually exhibiting, such competitive cash registers, so obtained in exchange, in the windows of stores wherein genuine cash registers of said the National Cash Register Company were on sale, bearing placards, in some cases with the word "junk" printed thereon, in other cases with the words "For Sale at Thirty Cents on the Dollar" printed thereon, and in still other cases bearing words of similar import derogatory of and damaging to said ·competitive cash registers; by exhibiting and offering for sale to some prospective purchasers of cash registers, cash registers in similitude of any particular competitive cash register any such prospective purchaser was contemplating buying, and this at a price in all cases much lower than the regular price of such competitive cash register and in some cases at a price much less than the manufacturer's cost of such competitive cash register, which cash register so exhibited and offered for sale to such prospective purchaser as. aforesaid was one manufactured by said the National Cash Register Company, solely as a so-called "knocker," in such close similitude of the competitive cash register in question as to enable the sales agents of said the National Cash Register Company to represent to such prospective purchaser, and impel such prospective purchaser to believe, as was often done, that it was in fact a cash register of such cheap and poor construction that it would be a waste of money to purchase it or the competitive cash register to which it was similar, such manufacture of such "knocker" by said the National Cash Register Company being discontinued when it was no longer useful as a "knocker"; by exhibiting and offering for sale, to other prospective purchasers of cash registers, cash registers in similitude of any particular cash register any such prospective purchaser was contemplating buying, and this at a price in all cases much lower than the regular price of such competitive cash register and in some cases at a price much less than the manufacturer's cost of such competitive cash register, which cash register so exhibited and offered for sale to such prospective purchaser as last aforesaid was in each case one manufactured by said the National Cash Register Company in such close similitude of the competitive cash register in question as to enable the sales agent of said the National Cash Register Company to represent to such prospective purchaser, and impel such prospective purchaser to believe, as was often done, it to be a counterpart thereof, when in fact it was a cash register having weak and defective interior mechanism and parts, and one manufactured by said the National Cash Register Company, with such weak and defective mechanism and parts, solely as a so-called "knocker," and for the very purpose of being so exhibited and offered for sale and enabling its sales agents to exhibit to such prospective purchaser such weak and defective mechanism and parts, and falsely claim that the competitive cash register to which it was similar had the same weak and defective mechanism and parts, as an argument against his purchasing any such cash register and one in favor of his pur-

chasing a genuine but more expensive cash register manufactured by said the National Cash Register Company, and at any rate for the purpose of shortly bringing about a sale of such genuine cash register to such purchaser, in case he insisted on purchasing such "knocker," through the failure of such "knocker" to operate, and for no other purposes, such manufacture of such last-mentioned "knocker" by said the National Cash Register Company being also discontinued when it was no longer useful as a "knocker"; and, finally, by instructing and requiring sales agents of said the National Cash Register Company, and persons employed for that purpose by that company, secretly to weaken and injure the interior mechanism, and remove and destroy parts of such mechanism, of such competitors' cash registers in actual use by purchasers as they could by any means get their hands upon, and this for the purpose of causing, as in many cases it actually did cause, persons who had purchased such competitive cash registers to become dissatisfied with them and substitute for them genuine cash registers manufactured by said the National Cash Register Company;

6. The making, in some cases, by said the National Cash Register Company, to such competitors, and to purchasers and prospective purchasers of such competitive cash registers, of threats to begin suits in the courts against them for infringing and for having infringed its patent rights pertaining to its genuine cash registers, when as said defendants each well knew, no such patent rights existed and no such suit was contemplated or would really be begun, and such threats were made merely to harass such competitors, purchasers and prospective purchasers, and deter such competitors from manufacturing and selling such competitive cash registers in such interstate trade and commerce, and such purchasers from using, and such prospective purchasers from buying and using, such competitive cash registers;

7. The beginning, in other cases, by said the National Cash Register Company, against such competitors, and against purchasers of such competitive cash registers, of suits for infringement of patent rights of said the National Cash Register Company pertaining to its genuine cash registers, when in those cases, as said defendants each well knew, no patents upon which such suits could be maintained were in existence or owned or controlled by said the National Cash Register Company, and when, as said defendants each well knew, none of those suits would be further pressed, but all such suits would be kept pending only as long as they served the purpose of harassing such competitors and purchasers;

8. The organizing of cash-register manufacturing concerns and cash-register sales concerns, and the maintaining of them, ostensibly as competitors of said the National Cash Register Company, but in fact as convenient instruments for use in gaining the confidence and obtaining the secrets of said real competitors of said the National Cash Register Company and accomplishing the objects of said unlawful conspiracy; and the making of such use, also, of competitive concerns the ownership and control of which said the National Cash Register Company from time to time secured by the means aforesaid, and this as long as the fact of such ownership and control by said the National Cash Register Company could be kept secret;

9. The inducing, by offers of much greater compensation than they were receiving from said competitors respectively, agents and servants of said competitors, and dealers patronizing said competitors exclusively, to leave the employment of said competitors or cease patronizing said competitors, to enter the employment of or patronize exclusively, said the National Cash Register Company; and this principally for the purpose of embarrassing said competitors and restraining their said interstate trade and commerce;

10. By applying, and causing applications to be made, for letters-patent of the United States, in some cases upon the cash registers of said competitors and in other cases upon improvements upon such competitive cash registers, and this merely for the purpose of harassing such competitors by interference proceedings and suits and threats to institute such proceedings and suits; and—

11. The using of, or originating and using of, and the instructing and requiring of such agents and sales agents of said the National Cash Register

Company to use, or to originate and use, such other unfair, oppressive, tortious, illegal and unlawful means, unlawfully, wrongfully and irresistibly excluding other concerns beside said the National Cash Register Company from engaging in said interstate trade and commerce, as might at any time become, or appear to said defendants or agents or sales agents to be, necessary or convenient (consideration being had for the exigencies of said interstate trade and commerce arising from its being carried on between widely-separated places under many differences of condition and demand) for engaging in and accomplishing the above-described objects of said unlawful conspiracy; a description of which said means last aforesaid, other than that they were similar in character to the means hereinabove described, said grand jurors are unable to set forth in this indictment because, as they charge the fact to be, such means were so numerous in kind and so shifting in character as to make such description impossible.

And so the grand jurors aforesaid, upon their oath aforesaid, do say, that said John H. Patterson, Edward A. Deeds, George C. Edgeter, William F. Bippus, William H. Muzzy, William Pflum, Alfred A. Thomas, Robert Patterson, Thomas J. Watson, Joseph E. Rogers, Alexander C. Harned, Frederick S. High, Pliny Eves, Arthur A. Wentz, George E. Morgan, Charles T. Walmsley, Charles A. Snyder, Walter Cool, Myer N. Jacobs, Mont. L. Lasley, Earl B. Wilson, Jonathan B. Hayward, Alexander W. Sinclair, John J. Range and Edgar Park, alias C. D. Foote, and M. G. Keith, W. M. Cummings, J. C. Laird, W. C. Howe and E. H. Epperson, during the three years next preceding the finding and presentation of this indictment, at and within said Western Division of said Southern District of Ohio, in manner and form in this count of this indictment aforesaid, unlawfully have knowingly engaged and consciously participated in a conspiracy in undue, unreasonable, direct and oppressive restraint of trade and commerce among the several states in cash registers, and one to restrain, and which has restrained, that trade and commerce by unfair, oppressive, tortious, illegal and unlawful means, and means which have unlawfully, wrongfully and irresistibly excluded others from engaging in that trade and commerce; against the peace and dignity of the United States, and contrary to the form of the statute of the same in such case made and provided.

### Second Count.

And the grand jurors aforesaid, upon their oath aforesaid, do further present, that said John H. Patterson [and the other defendants named in the first count], at divers times during the three years next preceding the finding and presentation of this indictment, at and within said Western Division of said Southern District of Ohio, under the circumstances and conditions, and by use of the means, set forth and described in the first count of this indictment, unlawfully have, by drawing to said the National Cash Register Company and causing that company to grasp it, monopolized a part of the trade and commerce among the several states in cash registers, that is to say, that part of said trade and commerce which, but for their use of those means, in carrying on the business and affairs of said the National Cash Register Company in said first count specified, would, during that period, have been secured or retained, as a matter of lawful right, by the divers concerns, other than said the National Cash Register Company, mentioned in said first count as having carried on business during said three years; said means being, as in said first count shown and charged, unfair, oppressive, tortious, illegal and unlawful under said circumstances as against said other concerns, and of a nature, under said circumstances, irresistibly to exclude those concerns from engaging in that trade and commerce; said grand jurors being unable, by reason of the great extent thereof, and because the same are unknown to them the said grand jurors, to enumerate or describe the items of such trade and commerce in cash registers so monopolized by said defendants; and the allegations of said first count descriptive of such cash registers, of said interstate trade and commerce in the same and the concerns engaged therein, and of the means employed by said defendants to restrain said interstate trade and commerce, and the allegations of said first count as

to knowledge, intent and overt acts on the part of and by said defendants, being by said grand jurors incorporated in this count by reference as fully as if they were repeated in this count as part of the charge of monopolizing in this count made; against the peace and dignity of the United States, and contrary to the form of the statute of the same in such case made and provided.

### Third Count.

And the grand jurors aforesaid, upon their oath aforesaid, do further present, that said John H. Patterson [and the other defendants named in the first count], having before the period of three years next preceding the finding and presentation of this indictment, in the manner, by the means, and under the circumstances and conditions, mentioned and described in the first count of this indictment, engaged, as said grand jurors, upon their said oath, here charge they did engage, in the unlawful conspiracy in said first count described, and having, in and by so engaging in that unlawful conspiracy, drawn as said grand jurors, upon their said oath, here charge they did draw, to said the National Cash Register Company, and caused, as said grand jurors, upon their said oath, charge they did cause, said the National Cash Register Company to grasp, a part of the trade and commerce among the several states in cash registers, that is to say, that part of said trade and commerce which, but for their so engaging in that unlawful conspiracy and their use of those means, in carrying on the business and affairs of said the National Cash Register Company in the manner and under the circumstances in said first count specified, would have been secured or retained, as a matter of lawful right, by the divers concerns, other than said the National Cash Register Company, mentioned in said first count as having carried on business before said period of three years (said means being, as in said first count shown and charged, unfair, oppressive, tortious, illegal and unlawful, under said circumstances, as against said other concerns, and of a nature, under said circumstances, irresistibly to exclude those concerns from engaging in that trade and commerce), and each of said defendants well knowing all the premises in this indictment aforesaid, unlawfully have, throughout said period of three years next preceding the finding and presentation of this indictment, continued to hold, conduct and carry on said interstate business of said the National Cash Register Company, so by said means before said period augmented, and thereby have monopolized said interstate trade and commerce in cash registers; said grand jurors being unable, by reason of the great extent thereof, and because the same are unknown to them the said grand jurors, to enumerate or describe the items of such trade and commerce in cash registers so as in this count aforesaid monopolized by said defendants; and the allegations of said first count descriptive of such cash registers, of said interstate trade and commerce in the same and the concerns engaged therein before said period of three years, and of the means so employed by said defendants to restrain said interstate trade and commerce, and draw to said the National Cash Register Company, and cause that company to grasp, said interstate commerce, and also the allegations of said first count as to knowledge and intent on the part of said defendants, being, by said grand jurors, incorporated in this count by reference as fully as if they were repeated in this count as part of the charge of monopolizing in this count made against said defendants; against the peace and dignity of the United States, and contrary to the form of the statute of the same in such case made and provided.

Sherman T. McPherson, U. S. Atty., of Cincinnati, Ohio, Oliver E. Pagan, of Washington, D. C., Edward Moulinier, Asst. Dist. Atty., of Cincinnati, Ohio, O. E. Harrison, Sp. Asst. Atty. Gen., of Columbus, Ohio, and John L. Lott, Sp. Asst. Atty. Gen., of Tiffin, Ohio, for the United States.

John F. Wilson, of Columbus, Ohio, and Lawrence Maxwell, of Cincinnati, Ohio, for defendants.

201 F.—45

HOLLISTER, District Judge. The indictment contains three counts, which may briefly and very generally be described as (1) a charge of conspiracy in restraint of interstate trade in cash registers during the three years preceding the date of the indictment, in the manner and by the means set forth; (2) a charge of creating a monopoly, during the same three years, of the cash register business by the means and in the manner set forth in the first count; (3) a charge of monopolizing such business, built up and augmented prior to the three years prior to the date of the indictment, through the conspiracy and by the means in the first count described, by continuing the business during those years.

The validity of the indictment is challenged on a number of grounds:

1. Because the matters and things set forth and charged do not constitute an offense against the laws of the United States.

2. Because the provisions of the act of Congress of July 2, 1890 (26 Stat. 209, c. 647), entitled "An act to protect trade and commerce against unlawful restraints and monopolies" are too vague, uncertain, and indefinite to create a criminal offense.

3. Because said act, in so far as it attempts to create offenses and impose penalties, is repugnant to the Constitution of the United States, and especially to section 1 of article 1, and to the provision of the fifth amendment, that no person shall be deprived of life, liberty, or property without due process of law, and to the provision of the sixth amendment, that in all criminal prosecutions the accused shall enjoy the right to be informed of the nature and cause of the accusation, and to the tenth amendment.

4. Because the averments are too general, vague, indefinite, and uncertain to inform the defendants of the nature and cause of the accusation against them, or to apprise them with such reasonable certainty of the offense with which they are charged or what they may expect to meet on the trial as to enable them to make their defense.

5. Because it is not charged that any of the defendants has done any act to effect the object of the pretended conspiracy, or, if any such act is intended to be charged by the matters and things alleged in paragraphs 1 to 11, inclusive, of the first count, the same is not charged with sufficient definiteness and certainty.

6. Because it undertakes to charge separate and distinct offenses, and is therefore bad for duplicity.

[1] Among others, the broad question is here presented whether or not there can be any criminal prosecution under the Sherman Anti-Trust Act. The question is of the utmost importance. There is apparently much diversity of opinion upon it, and the Supreme Court have not yet directly passed upon the subject.

Counsel for defendants admit—as they must, in view of the many decisions of the Supreme Court sustaining civil actions under the act, brought either by the government or by individuals by virtue of express provisions of the act—that civil actions may be prosecuted, but contend that by reason of alleged vagueness and uncertainty, brought about by the decisions in the Standard Oil Case, 221 U. S. 1, 31 Sup.

Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, and the Tobacco Case, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, and because the statute itself fixes no standard of lawfulness or unlawfulness to which the conduct of individuals or corporations may be referred, no criminal prosecution can be based upon it.

The statute is vague and uncertain, they say, because, as they assume, the Supreme Court in United States v. Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, and United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259, have held that every restraint of trade, however slight or in whatsoever way it might be regarded at common law, comes under the ban of the statute; that by the later decisions the Supreme Court have interpolated the word "unreasonable" into the statute, and hence no man is advised by the statute whether any act contemplated by him is unreasonable or not; and that, as he cannot know, neither can any 12 men who are called upon to determine the quality of his acts, and that one jury might take one view and another jury a different view of the same conduct. Predicating their case on these assumptions, the defendants cite important authorities in support of their conclusion.

The substance of all the decisions relied on by them is found briefly stated by Justice Brewer, sitting with Caldwell, Circuit Judge, in Tozer v. United States (C. C.) 52 Fed. 917, 919:

"In order to constitute a crime, the act must be one which the party is able to know in advance whether it is criminal or not. The criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty."

The subject is discussed at length in a decision by Judges Baxter, Hammond, and Key in this circuit. Louisville & Nashville R. R. Co. v. Railroad Commission of Tennessee (C. C.) 19 Fed. 679. The case involved a statute of Tennessee, which created a Railway Commission. with power to revise tariffs and make new rates, if the present rate "is more than a just and reasonable compensation," or "amounts to unjust and unreasonable discrimination." The act provided, also, that the new rates were to be "a just and reasonable compensation," and if the corporations continued to demand more than that they were subject to indictment, and that "no rates or charges for service in the transportation of freight over any railroad shall be held or considered extortionate or excessive," if the evidence showed that the net earnings from its traffic would not amount to more than "a fair or just return" on a certain valuation. The statute was held invalid, because its provisions were too indefinite, vague, and uncertain to sustain a suit for the penalties imposed, and did not sufficiently define the offenses declared in it.

The same conclusions are found in Louisville & Nashville R. R. Co. v. Commonwealth, 99 Ky. 132, 35 S. W. 129, 33 L. R. A. 209, 59 Am. St. Rep. 457, United States v. Capital Traction Co., 34 App. D. C. 592, 19 Ann. Cas. 68, Czarra v. Board of Supervisors, 25 App. D. C. 443, and Ex parte Jackson, 45 Ark. 158.

This claimed want of standard is emphasized in C., B. & Q. R. R. v. Jones, 149 Ill. 361, 37 N. E. 247, 24 L. R. A. 141, 41 Am. St. Rep.

278, and Railroad v. People, 77 Ill. 443, in which, under a statute similar to the Tennessee statute, it was held that the want of certainty of standard in the first section would not invalidate the act, because the eighth section provided for schedules of reasonable and maximum rates to be made by the Railroad Commission. In other words, there was a standard of rates provided by the act to which the railroads could conform.

The defendants justly attach importance to the report of the judiciary committee of the Senate, January 27, 1909, upon the then proposed amendment of the anti-trust act that:

"No suit or prosecution by the United States under the first six sections of the said act, approved July 2, 1890, shall hereafter be begun for or on account of this act, or any action thereunder, unless the same be an unreasonable restraint of trade or commerce among the several states or foreign nations."

This committee of eminent lawyers reported adversely, saying (page 10 of their report):

"The Anti-Trust Act makes it a criminal offense to violate the law, and provides a punishment both by fine and imprisonment. To inject into the act the question of whether an agreement or combination is reasonable or unreasonable would render the act, as a criminal or penal statute, indefinite and uncertain, and hence to that extent * * * nugatory and void, and would practically amount to a repeal of that part of the act. * * * Justice Brewer, in the case of Tozer v. United States, 52 Fed. 917, makes this perfectly clear and plain. In this case the defendant was indicted for violating the interstate commerce act, * * * and upon this the court holds: 'In order to constitute a crime, the act must be one which the party is able to know in advance whether it is criminal or not. The criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be definiteness and certainty. * * * No penal law can be sustained, unless its mandates are so clearly expressed that any ordinary person can determine in advance what he may and what he may not do under it.'"

Justice Harlan, in his dissenting opinion in the Standard Oil Case (221 U. S. 96, 97, 98, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834), quotes at length from that part of the report which deals with this subject. It is not to be overlooked, however, that the learned justice did not himself express an opinion on the point.

Attorney General Bonaparte and Solicitor General Hoyt, in their briefs in American Express Co. v. United States, 212 U. S. 522, 29 Sup. Ct. 315, 53 L. Ed. 635, commenting upon the failure of the Elkins Act to limit the word "discrimination" to "undue" or "unreasonable" or "unjust," argue that criminal prosecutions could not be based successfully upon statutes defining an offense with such uncertainty as the use of these adjectives import into them.

But even if defendants' assumption of the effect upon this statute of the decisions in the Standard Oil Case and the Tobacco Case be acquiesced in, and even if the word "unreasonable" were actually written into the law, there is strong ground for holding that the Supreme Court have in effect already decided the question.

Waters-Pierce Oil Co. v. Texas, 212 U. S. 86, 29 Sup. Ct. 220, 53 L. Ed. 417, on error to the Court of Civil Appeals for the Third Supreme Judicial District of Texas, involved the anti-trust statutes of that state, which made it unlawful for any corporation transacting or

conducting any kind of business in Texas to enter into or become a party to any agreement or understanding with any other corporation or individual to fix or regulate the price in Texas of any article of manufacture or merchandise, or to control or limit in Texas the trade in any article of manufacture or merchandise. It was further made unlawful for any such corporation to bring about or permit any union or combination of its capital, property, trade, or acts with the capital, property, trade, or acts of any other person or corporation, whereby the price in Texas of any article of manufacture or merchandise would be fixed or sought to be fixed, regulated or sought to be regulated, or whereby the price in Texas of any such article would be reasonably calculated to be fixed or regulated, or whether the trade in such article would be sought to be controlled or limited, or would be reasonably calculated to be controlled or limited.

It was in that case, among other things, insisted that the anti-trust laws of Texas were "so vague, indefinite, and uncertain as to deprive them of their constitutionality, in that they punish by forfeiture of the right to do business, and the imposition of penalties, under provisions of an act which do not advise a citizen or corporation, prosecuted under them, of the nature and character of the acts constituting a violation of the law." The objections are found in the words denouncing contracts and arrangements "reasonably calculated" to fix and regulate the price of commodities, etc., and acts which "tend" to accomplish the prohibited results.

The Supreme Court held that the anti-trust laws of Texas were not in contravention of the Constitution, as depriving any one of due process of law, because vague and indefinite in the prohibition of acts which "tend" or are "reasonably calculated" to restrain trade and competition. The opinion was delivered by Justice Day, who cites Tozer v. United States (C. C.) 52 Fed. 917, Railroad Co. v. Dey (C. C.) 35 Fed. 866, 1 L. R. A. 744, and Louisville & Nashville R. R. Co. v. Commonwealth, 99 Ky. 132, 35 S. W. 129, 33 L. R. A. 209, 59 Am. St. Rep. 457, and distinguishes the Texas statutes from these, in that those statutes—

"do not give the broad power to a court or jury to determine the criminal character of the act in accordance with their belief as to whether it is reasonable or unreasonable, as do the statutes condemned in the cases cited."

And he goes on to say that the criminal law punishes not only a completed act, but also acts which attempt to bring about the prohibited result, and that it is sufficient if the acts really tend to bring about monopoly and to deprive the public of the advantages which flow from free competition. And he says further (212 U. S. 110, 29 Sup. Ct. 227, 53 L. Ed. 417):

"As to the phrase, 'reasonably calculated,' what does it include less than acts which, when fairly considered, tend to accomplish the prohibited thing, or which make it highly probable that the given result will be accomplished?"

He notes the fact that the decisions which announce the rules on which his opinion is based are in civil cases arising under the Sherman Anti-Trust Act, but he draws no conclusion from the fact. He also notes that the Texas laws were enacted by the Legislature of that

710 201 FEDERAL REPORTER

state and sustained in its courts, and then says (212 U. S. 111, 29 Sup. Ct. 227, 53 L. Ed. 417):

"We are not prepared to say that there was a deprivation of due process of law because the statute permitted, and the court charged that there might be a conviction not only for acts which accomplished the prohibited result, but also for those which tend or are reasonably calculated to bring about the things forbidden."

There would seem to be little difference in principle between submitting to a jury the question whether certain acts were "reasonably calculated" to bring about a certain result, and submitting to them the question whether acts in restraint of trade were unreasonable or not.

One cannot escape the conviction, after considering this decision, that the anti-trust acts of Texas are upheld as criminal statutes, not because of the difference in breadth of power given a court or jury to determine the criminality of an act in accordance with their belief in its reasonableness or unreasonableness, as the case might be, or because through process of law one charged with an offense under them could have his day in court, but because the Supreme Court of the United States in United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, the Addyston Pipe Case, 175 U. S. 237, 20 Sup. Ct. 96, 44 L. Ed. 136, the Northern Securities Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, and in Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, have decided that it is not essential, in order to bring a contract or combination in restraint of trade under the act, that its result should be a complete monopoly, but it was sufficient if it really tended to that end, and to deprive the public of the advantages which flow from free competition.

A clear deduction from this would seem to be that while in civil cases it is sufficient that a contract is in restraint of trade in the meaning of the act when it tends to restrain trade, so in criminal cases the same rule should be applied, as it indeed was applied in the Texas case, and that when a contract tends to restrain trade, or the acts complained of are "reasonably calculated," or are acts which "tend," to accomplish the prohibited thing, then the definition of the offense in a criminal statute containing such a description is not vague and uncertain, and it is not undue process of law to permit a jury to determine the tendency of the acts proscribed, and whether or not they are reasonably calculated in their tendency to accomplish the prohibited thing. In the evolution of the common law to meet changed conditions, an act directly tending to restrain trade, or the purpose of which was to restrain trade, was an unreasonable restraint, because it brought about an injury to the public, caused by enhancement of prices which the common law in the beginning sought to avoid.

The extent to which the Supreme Court have gone in upholding criminal statutes containing adjectives not exactly describing the offense at which the statute is aimed, but leaving room for the exercise by the jury of some discrimination in determining whether or not the acts complained of come within the characterization of the adjective, is illustrated by the case of Ellis v. United States, 206 U. S. 246, 27 Sup. Ct. 600, 51 L. Ed. 1047, 11 Ann. Cas. 589, in which the act

of August 1, 1892 (27 Stat, 340, c. 352 [U. S. Comp. St. 1901, p. 2521]), limiting the hours of laborers and mechanics employed by the United States or any contractor or subcontractor upon any of the public works of the United States to eight hours per day except in cases of "extraordinary emergency." Necessarily what constitutes an extraordinary emergency is a matter of opinion. Different juries might disagree on the same facts, and yet the court were clearly of opinion that whether or not the facts in the particular case constituted an extraordinary emergency might be left to the jury. And, further than that, the court seemingly have taken advanced ground in the modern desire and process of simplifying and freeing from ancient technicalities the administration of the law·in criminal cases, by declaring that the judge below did right in instructing the jury that the evidence.did not show an "extraordinary emergency" within the meaning of the act. In delivering the opinion of the court, Justice Holmes says (206 U. S, 257, 27 Sup. Ct. 601, 51 L. Ed. 1047, 11 Ann. Cas. 589):

"Even if, as in other instances, a nice case might be left to the jury, what emergencies are within the statute is merely a constituent element of a question of law, since the determination of that element determines the extent of the statutory prohibition and is material only to that end. The ruling was correct."

There seems to be firm ground upon which to base a ruling, even if the word "unreasonable" had been written into the statute, or even if the Supreme Court have read the word "unreasonable" into the statute, that the anti-trust act would not be so vague and uncertain, and so lacking in establishing a standard to which the acts of merchants must conform as to infringe any constitutional guaranties. But it is not true that the decisions in the Standard Oil Case and in the Tobacco Case have introduced the word "unreasonable" into the statute, or have required the use of that adjective in describing such acts as are to be avoided by those who wish to comply with the law, and it is not true that there is no standard erected by the statute by reference to which a man may know whether or not his acts come· within its inhibition.

The Supreme Court say in those cases that the statute must be interpreted in the light of reason, guided by the principles of law, and to effect the purpose the law against restraints of trade always had in view. That purpose originally was to prevent restraints of any kind upon the free flow of commerce, since restraints brought about the attendant evils, particularly the enhancement of prices. The evils were at first supposed to flow from every restraint upon commerce, and the common law forbade any restraint. But in the course of time and under changed conditions it was seen that the application of the common law in its strictness was a bar to the free flow of commerce and proper development of trade, rather than a protection to it; and for that reason, but to accomplish the same purpose, namely, the protection of the public and the preservation of the right of individuals to contract, a rule by way of exception to the common law arose, which looked to the purpose or motive which underlaid contracts or acts in·restraint of trade. If the purpose was to injure the public, by limit-

ing or suppressing competition and the right of individuals to contract, thereby enhancing prices and bringing about monopoly in whole or in part, or tending to do either, then such contracts or acts were held, under the changed condition of things, to be in restraint of trade.

Partial restraints—restraints incidental or collateral to the main purpose of the contract, accidental, secondary, or remote, and not directly the effect of it—are not regarded as restraints in the view of the law, in that they do not bring about the evils to which the public and individuals are subject by the suppression or the limiting of free competition, which same evils were aimed at by the rule at common law as it was originally and as it, in its evolution to bring about the same ends, has become; that is to say, such restraints are not wrongful. This is clearly pointed out by Chief Justice White in the Standard Oil Case, and he shows that that was the state of the law at the time the Sherman Anti-Trust Act was passed, both in England and in the United States (Standard Oil Case, 221 U. S. 56, 31 Sup. Ct. 514, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834 et seq.), and he shows to the extent of conclusive demonstration that, notwithstanding the apparent decisions in the Freight Association Case and in the Joint Traffic Association Case, in reality the rule applied in their decision was the same as the "rule of reason" adopted in the Standard Oil Case. He proves that the contracts enjoined in those cases were enjoined, not because there might incidentally result some restraint of trade in their operation, but because they operated directly and immediately upon interstate trade, and thereby suppressed or limited competition and created or tended to create monopoly, which results the common law forbade from the beginning. After reviewing the early English cases and acts of Parliament on the subject he says:

"From the review just made it clearly results that outside of the restrictions resulting from the want of power in an individual to voluntarily and unreasonably restrain his right to carry on his trade or business and outside of the want of right to restrain the free course of trade by contracts or acts which implied a wrongful purpose, freedom to contract and to abstain from contracting and to exercise every reasonable right incident thereto became the rule in the English law."

And as the conclusion and the summing up of the whole matter he says (221 U. S., at page 58, 31 Sup. Ct. at page 515, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834):

"Without going into detail and but very briefly surveying the whole field, it may be with accuracy said that the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation on competitive conditions caused by contracts or other acts of individuals or corporations, led, as a matter of public policy, to the prohibition or treating as illegal of all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, *but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as the enhancement of prices, which were considered to be against public policy.*" (The italics are mine.)

When, therefore, a contract is of such character that it in itself directly brings about a restraint of trade, or tends to do so, it is wrongful, and comes within the description and meaning of the anti-trust act. The purpose of such a contract is disclosed on its face, and the contractors will be presumed to intend the consequences it naturally entails. When the acts which are in restraint of trade, or monopolize—which is the same thing (Standard Oil Case, 221 U. S. 61, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834)—or tend to monopolize trade, are proved, it is decided that the persons charged are to be held to have intended the necessary and direct result thereof. Addyston Pipe Co. v. United States, 175 U. S. 216, 243, 20 Sup. Ct. 96, 44 L. Ed. 136.

In Ellis v. United States, 206 U. S. 246, 257, 27 Sup. Ct. 600, 602, 51 L. Ed. 1047, 11 Ann. Cas. 589, it appears that Ellis attempted to justify the employment on a public work undertaken by him of men for nine hours a day (the statute making such employment for more than eight hours unlawful) on the ground that he had more difficulty than he expected in getting certain oak and pine piles called for by the contract and was in a hurry to get the work done. The trial court instructed the jury that, if Ellis intended to permit the men to work over eight hours, he intended to violate the statute. In passing upon this charge, Justice Holmes said:

"The argument against the instruction is that the word 'intentionally' in the statute requires knowledge of the law, or at least that to be convicted Ellis must not have supposed, even mistakenly, that there was an emergency extraordinary enough to justify his conduct. The latter proposition is only the former a little disguised. Both are without foundation. If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent."

"In every case," says Chief Justice White, "where it is claimed that an act or acts are in violation of the statute, the rule of reason, in the light of the principles of law and the public policy which the act embodies, must be applied." Standard Oil Case, 221 U. S. 66, 31 Sup. Ct. 518, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834.

From the decisions in the Standard Oil Case and in the Tobacco Case and in the cases in the Supreme Court involving the anti-trust act, and the evolution of the common law (Oregon Steam Navigation Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315; Gibbs v. Consolidated Gas Co., 130 U. S. 396, 409, 9 Sup. Ct. 553, 32 L. Ed. 979; National Cotton Oil Co. v. Texas, 197 U. S. 115, 25 Sup. Ct. 379, 49 L. Ed. 689; Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865; Mogul Steamship Co. v. McGregor, L. R. [1892] A. C. 25, as illustrations) to meet modern conditions, and not to unduly restrain, but to encourage, trade, it may be said that a contract, combination, or conspiracy is in restraint of trade when it directly affects trade, and is entered into with intent to do wrong to the general public and to individuals, by restraining the free flow of commerce, and by bringing about or tending to bring about the maintenance or enhancement of prices, which, but for such acts, would adjust themselves

under conditions of free competition. Here, then, is to be found the standard of conduct, the absence of which, say the defendants, nullifies the criminal provisions of the anti-trust act. See remarks of the Chief Justice, Standard Oil Case, 221 U. S. 58, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834.

The defendants admit, as they must, that ignorance of the law will not excuse them. They must be held, then, to have known that at common law every restraint of trade was wrongful, and hence that, if they did what the indictment charges them with having done, their acts were contrary to the anti-trust act in its literal language; and they must be held to know of the exception to the common law which gives them a wider field of operation—which makes every restraint, brought about with the wrongful purpose of preventing the free flow of commerce and limiting the right of the individual to contract, unlawful. Let the act be interpreted either literally or in the light of reason— that is to say, to effect the purposes of the common law as they were from the beginning, whether meaning any restraint at all, or any restraint brought about by wrongful purpose—the defendants, if the acts charged in the indictment are true, were advised of the prohibitions of the act and the penalties provided therein. If the facts alleged are true, wrongful purpose is disclosed in every one of them. Indeed, if the defendants have in fact done what they are charged with having done, there is exhibited in this indictment a flagrant case of commercial piracy.

While the Supreme Court have not as yet directly sustained the validity of the anti-trust act as a criminal statute, yet the subject has received consideration by eminent authority. The constitutionality of the act has been sustained by Judge Carpenter in the Beef Trust prosecution, in his charge to the jury; by Judge Angell in the Bath Tub Trust prosecution, in which he overruled the demurrer to the indictment; by Judge Hand, in the Sugar Trust prosecution; and by Judge Putnam, in the Shoe Machinery Trust Case (D. C.) 195 Fed. 578, all since the decisions in the Standard Oil Case and in the Tobacco Case.

The act does not primarily grant any right to be enforced in a civil action. It creates an offense, a crime, describing what the crime is. To do the acts proscribed in the first and second sections is declared to be unlawful; that is to say, criminal. Hence the right given by section 7 to an individual to recover for injury to his business or property with threefold damages, and the right given by section 4 to the government to prevent by injunction a continuance of the acts complained of, are rights growing out of the commission of a crime, by whomsoever it may be, whose acts also subject him to the criminal penalties of the statute. If he has been guilty of a crime described in sections 1 or 2, then he may be restrained by the government in a civil action, or be compelled by an individual who has been injured in his business or property to respond in threefold damages.

In United States v. Swift (D. C.) 188 Fed. 92, 95, 96, 97, the so-called Beef Trust prosecution, Judge Carpenter points this out very clearly, showing that the Supreme Court must have considered and passed on the act as a criminal statute in giving effect to the civil

proceedings provided by it. And it is most persuasive that Chief Justice White, then Associate Justice, in his dissenting opinion in the Freight Association Case, 166 U. S. 290, at page 353, 17 Sup. Ct. 540, at page 563 (41 L. Ed. 1007), says:

"The well-settled rule is that where technical words are used in an act, and their meaning has previously been conclusively settled, by long usage and judicial construction, the use of the words without an indication of an intention to give them a new significance is an adoption of the generally accepted meaning affixed to the words at the time the act was passed. *Particularly is this rule imperative where the statute in which the words are used creates a crime, as does the statute under consideration, and gives no specific definition of the crime created.* Thus in United States v. Palmer, supra, Mr. Chief Justice Marshall, referring to the term 'robbery,' as used in the statute, said (3 Wheat. 630, 4 L. Ed. 471): 'Of the meaning of the term "robbery," as used in the statute, we think no doubt can be entertained. It must be understood in the sense in which it is recognized and defined at common law.'" (The italics are mine.)

But it is suggested by counsel for defendants that, inasmuch as there is great contrariety of opinion as to the meaning of the law in its operation as a criminal statute, the demurrer be sustained, in order that the government may, as authorized by law, at once take the case to the Supreme Court for an early decision, and thereby save the time of the court here, and the annoyance and great expense attendant upon such a long trial as would result from the overruling of the demurrer. One cannot but appreciate the force of this suggestion, and its adoption would be an easy way to dispose of the matter; but, on the other hand, there is upon this court the plain duty of deciding the case according to conviction, and of so deciding as to make the law effective, rather than to destroy it if its constitutionality is fairly clear. This is in accordance with the established rule that an act of Congress should not be set aside as unconstitutional unless clearly so. United States v. Coombs, 12 Pet. 72, 76, 9 L. Ed. 1004; Presser v. Illinois, 116 U. S. 252, 269, 6 Sup. Ct. 580, 29 L. Ed. 615; Hooper v. California, 155 U. S. 648, 657, 15 Sup. Ct. 207, 39 L. Ed. 297; Knights Templars et al. v. Jarman, 187 U. S. 197, 205, 23 Sup. Ct. 108, 47 L. Ed. 139; United States v. Delaware & Hudson Co., 213 U. S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836.

I hold, therefore, from all of these considerations, that the Sherman Anti-Trust Act is a valid criminal statute, sufficiently clear in itself to inform the accused of the nature and cause of the accusation against them, and that criminal prosecutions under it in no way deprive the defendants of liberty or property without due process of law.

[2] If this conclusion is right, the defendants are presumed to know the law applicable to their acts or contemplated acts, and are presumed to intend the consequences of them as heretofore shown. The discussion might end here; but other considerations suggest themselves, which, while perhaps not necessary for decision, are so pertinent as to warrant some reference.

Having in view the purposes of the common law and of the exception which has grown up in its evolution, and appreciating that these purposes are the same, there seem to be compelling reasons for the conclusion that moral considerations are involved in the question

of the intent with which an act in restraint of trade is done. Judge Hook puts it this way:

"There is more of the decalogue in the common law respecting the trading of merchants than is sometimes supposed." United States v. Standard Oil Co. (C. C.) 173 Fed. 177, 196.

Eminent authority, beginning with Lord Chief Justice Hale (Taylor's Case, 1 Vent. 293, 3 Keb. 607), have declared that the Christian religion is a part of the law of England. There are in a number of states decisions to the effect that the same is true of the law of the United States, and it is said by Justice Brewer in Church of Holy Trinity v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, that the United States is a Christian nation. No finding on this question is here made, for it is not necessary; but it may safely be said that civilization, as we understand it, so far as the recognition of the individual in the community and his rights are concerned, is the outgrowth of the appreciation that, among many other things, dealings between man and man must be on terms of justice, and justice requires that no man shall build up his business by acts whose purpose is to put the purchasing public at his mercy or to exploit others for his advantage, and destroy thereby the opportunities of others to exercise their talents and desires in the same field of mercantile activity. The common law in many of its phases developed through the appreciation of these rights and is based upon justice in the abstract. It may therefore be said to have a moral basis.

The ancient law against some voluntary restraint put by contract on an individual's right to carry on his particular trade or calling was established because it was deemed that such restraints were injurious to the public as well as to the individuals who made them; and the evils of monopoly are:

"(1) The power which the monopoly gave to the one who enjoyed it to fix the price and thereby injure the public; (2) the power which it engendered of enabling a limitation on production; and (3) the danger of deterioration in quality of the monopolized article which it was deemed was the inevitable resultant of the monopolistic control over its production and sale." Standard Oil Case, 221 U. S. 52, 31 Sup. Ct. 512, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834.

It was unjust to the community that a man should contract away his right to do business, and thereby possibly become, with his family, a charge on the community. It was unjust to the community to monopolize a product, and thereby enhance, or have the power to enhance, the prices the public were to pay for it. It was unjust to deprive an individual of his right and power of freely contracting, and of carrying on any lawful business he desired, and selling his product at prices fixed by free competition; and it was recognized that when the evils were brought about by the purpose to inflict them then that purpose was wrongful, and wrongful because unjust. If in a remote and comparatively barbarous civilization every contract in restraint of trade was deemed wrong, hence unlawful, because it was thought to work an injury to the public and to individuals, and if in our own time of advanced civilization the contract in restraint of trade is held to be wrong, hence unlawful, because its purpose is to bring about the same

injuries, then the motive underlying the contract is the criterion by which the contract is to be judged.

If in the doing of a thing a man entertains a wrongful purpose, he knows it better than anybody else can know it. And if, under the law, a man is presumed to intend the consequences of his acts, how much the more must he be held blameworthy when his deliberate purpose is to bring about the evils condemned by the common law from the beginning—condemned because restraints of trade were wrongful to the community and to the individual and wrongful because they were unjust?

It is hard to sympathize with the often-repeated expression that a merchant is not advised by the anti-trust act of the character of a contemplated act. If the act is wrong under commonly accepted moral or ethical standards, it was wrong at common law, and wrong under the exception to the common law, and always was and always must be wrong, so long as there is community life, with common and relative rights belonging to each individual in the community and to the public as a whole. How can any fair-minded man engaged in trade, whose deliberate purpose in his acts and contracts in trade is to work injustice to his competitors and to the public, honestly claim want of knowledge of the quality of his acts? The Golden Rule may not as yet be the standard by which the law requires contracts in restraint of trade to be measured, but the ancient adage, "Live and let live," has its application to trade and is a safe rule to go by.

But it is said that contracts and acts in restraint of trade were not criminal at common law. It is unnecessary to decide whether they were or not, for they are made criminal by the anti-trust act, and by it the defendants were advised either that it meant every contract in restraint of trade, a construction which would hamper rather than encourage trade, or that it meant such contract, the purpose of which was wrongful in the sense so often hereinbefore stated.

The claim that the act is in contravention of section 1 of article 1 of the Constitution, which lodges all legislative power in the Congress, and of the tenth amendment, which reserves to the states or the people powers not delegated to the United States by the Constitution, nor prohibited by it to the states, is passed with only the remark that the Supreme Court in the Standard Oil Case and the Tobacco Trust Case did not attempt to make the law, but merely to declare it, as was their duty, and that it is now somewhat late, in view of the many decisions of the Supreme Court upholding the act in question, to claim that Congress has no power to regulate interstate commerce through the means adopted in this act. Northern Securities Case, 193 U. S. 197, 347, 24 Sup. Ct. 436, 48 L. Ed. 679.

[3] We pass, then, to the grounds of complaint directed to specific allegations in the indictment itself. It is claimed that the averments in the several counts are too general, vague, indefinite, and uncertain to inform the defendants of the nature and cause of the accusation against them, or to apprise them with such reasonable certainty of the offense with which they are charged, or what they may expect to meet on the trial, as to enable them to make their defense.

The first count describes cash registers, with the statement that for

the past 20 years many concerns have been engaged in the business of manufacturing and selling them, and sets forth the names of some 33 different cash register companies, and avers that of the total business of making cash registers the National Cash Register Company has done from approximately 80 per cent., early in the period of the 20 years, to approximately 95 per cent. at the latter end therof. It then avers that all the cash register companies during that time have sold the greater portion of their product to users and dealers in all other parts of the United States than those wherein the registers were manufactured, and have consigned registers for sale to dealers, and to their own agents, in other states, and shipping the same to these various persons, the number of which would be impracticable, if not impossible, to set forth. It then sets forth a list of names of some 137 individuals, who were officers and agents of the National Cash Register Company, and the dates at which each had been actively engaged in the management of the business and the nature of his official relation to the company. Included in the list are the names of 30 persons who are the defendants in the case, and the count charges that by virtue of their official relation to the company they controlled and directed its business from the dates when they became officers or agents, and that they knowingly and consciously participated in a corrupt conspiracy in undue, unreasonable, direct, and oppressive restraint of the interstate trade described and carried on by the several concerns other than the National Cash Register Company; that is to say, a conspiracy to restrain, and which did restrain, such commerce, and by divers unfair, oppressive, tortious, illegal, and unlawful means, and means which, "consideration being given to the advantage over said other concerns held by said the National Cash Register Company in consequence of its resources being, as they were, so great as compared with those of such other concerns, respectively," the defendants "have unlawfully, wrongfully, and irresistibly excluded others from engaging in that trade and commerce, none of which has been justified or warranted by any letters patent." Then a description of the conspiracy and means are set forth, the effect of which is that the defendants intended to restrain the free flow of interstate trade so carried on by the concerns named, other than the National Cash Register Company, and to compel those concerns either to go out of business or sell and transfer their business to the National Cash Register Company, so that it could, as in most cases it did, discontinue the business of the other concerns so acquired by it, and thereby effectually eliminated and prevented all competition of the other concerns with the National Cash Register Company.

The count then goes on to say that the defendants, as officers and agents of the National Cash Register Company have "by concerted action and continuous endeavor carried on the business and affairs of said the National Cash Register Company upon a plan involving—" Then follow 11 different descriptions of acts, all of a general character, so far as the naming of particular instances is concerned, but all very specific as describing a course of conduct. And the count winds up with the charge that the 30 defendants "during the three years next preceding the finding and presentation of this indictment,

at and within said Western Division of said Southern District of Ohio, in manner and form in this count of this indictment aforesaid, unlawfully have knowingly engaged and consciously participated in a conspiracy in undue, unreasonable, direct, and oppressive restraint of trade and commerce among the several states in cash registers, and one to restrain, and which has restrained, that trade and commerce by unfair, oppressive, tortious, illegal, and unlawful means, and means which have unlawfully, wrongfully, and irresistibly excluded others from engaging in that trade and commerce."

It would manifestly be impossible to set forth in detail each separate transaction and the names of the individuals engaged therein, by which those plans of operation were carried out, without producing a paper so voluminous as probably to warrant the court in striking it from the files of its own motion as needlessly incumbering the record. The names of the individuals who carried on the various transactions, the names of the other cash register companies which were dealt with as alleged, and the quality and character of the acts by which the alleged illegal results were obtained are all clearly detailed. If there were no such transactions, then, of course, the government would fail; and if there were any innocent transactions through any of these individuals or other employés of the National Cash Register Company who are named, all the facts connected with those transactions are in the possession of the defendants, who know them better than anybody else can know them, and if they are susceptible of an explanation consistent with innocence, the defendants know whom to call in their defense. It would seem that the particulars for which the defendants call are matters of evidence which the government must produce when it attempts to prove the charges made by it. King v. Eccles, 1 Leach, 274; King v. Parsons, 1 Bl. Rep. 392; Cope's Case, 1 Strange, 144.

These defendants are charged with a conspiracy in restraint of trade in cash registers generally, and particularly that carried on by the several concerns named. The defendants, as officers and agents of the National Cash Register Company, were in control of its affairs, as alleged. They know the detail of dealings between that company and each of those concerns, and the manner of treatment of them by the National Cash Register Company as the agency through which the officers and agents controlled and operated, and the methods of their respective absorption, if they were absorbed, by the National Cash Register Company. They must know whom to call in each to establish their defense. It seems to me they are advised of the nature of the charges against them quite sufficiently for them to make a defense, and that, under the peculiar circumstances of the case, it is sufficient to set out the character of the acts of the defendants controlling the National Cash Register Company, and that these acts had to do with the various other cash register companies named. While no direct authority may be found completely justifying a charge in an indictment framed as this is, yet I think it meets the rule of particularity of time, place, and circumstances, laid down in United States v. Cruikshank 92 U. S. 542, 23 L. Ed. 588, United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516, and other cases.

The Supreme Court say that the object of an indictment is to fur-

nish the accused with such a description of the charge as will enable him to make his defense and avail himself of his conviction or acquittal for protection against further prosecution for the same cause, and to inform the court of the facts alleged, so that it may decide whether it is sufficient in law to support a conviction, if one should be had. They say that a crime is made up of acts and intents, and that these must be set forth in the indictment with reasonable particularity as to time, place, and circumstance. The facts alleged reasonably meet this test. In this connection the remarks of Mr. Justice Holmes in Swift & Co. v. United States, 196 U. S. 375, 395, 396, 25 Sup. Ct. 276, 49 L. Ed. 518, and of Judge Adams in Smith v. United States, 157 Fed. 721, 725, 85 C. C. A. 353, may be read with profit.

[4] In early times, and extending up to not a very remote period, when there were many capital offenses which would now be regarded as comparatively trivial, indictments were subjected to the closest scrutiny by the judges, and reasons in the highest degree technical were availed of to save the infliction of the severest penalty. Those reasons no longer obtain, and the effort now on the part of the judges is to overlook technicalities, so far as possible, and to administer the law from a broad viewpoint looking to ultimate justice upon the merits of the particular case. This ground of demurrer is, therefore, held to be untenable.

On the ground that no offense against the laws of the United States is charged in the indictment, in addition to other grounds of demurrer going to the same point, the defendants claim the indictment is otherwise fatally defective in that, according to my understanding of their contention—

[5] (1) The anti-trust act is one of generic terms, as frequently stated in the Standard Oil Case and in the Tobacco Case, and it is not sufficient to charge a crime in the general language of such a statute; but the specific acts constituting the offense must be set forth with reasonable particularity of time, place, and circumstance, as said in United States v. Cruikshank, 92 U. S. 542, 558, 23 L. Ed. 588:

"It is an elementary principle of criminal pleading, that where the definition of an offense, whether it be by common law or statute, includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species—it must descend to particulars."

And a number of cases are cited. This claim involves considerations already referred to. If the first count is examined with care, it will appear (page 2) it is charged that during 20 years prior to the finding of the indictment many concerns were engaged in competition with each other in the manufacture and sale of cash registers, and a list of such concerns as were known to the grand jurors was set forth. On pages 10 and 11 of the indictment the defendants are charged with having entered into a conspiracy in restraint of said interstate trade carried on by the several concerns named, intending to restrain the free flow of interstate trade, and (page 20) defendants are charged with—

"a conspiracy in undue, unreasonable, direct, and oppressive restraint of trade and commerce among the several states in cash registers, and one to

restrain, and which has restrained, that trade and commerce by unfair, oppressive, tortious, illegal, and unlawful means, and means which have unlawfully, wrongfully, and irresistibly excluded others from engaging in that trade and commerce."

We are dealing with the first count, for the others refer to it, and it will be seen from a consideration of the entire count that not only is the general charge made of restraint of trade in cash registers, but the specifications go to that part of interstate trade in cash registers which these certain concerns other than the National Cash Register Company carried on. The authorities are numerous that a contract in restraint of trade is unlawful, if it directly restrains or tends to restrain that trade, or its purpose is to accomplish either of these ends. It would seem that when there is a general charge of restraint of all trade in cash registers, and the specific facts alleged show that, if true, the defendants have restrained a part of that trade, an offense against the laws of the United States has been alleged.

(2) The defendants claim also that there is really no charge of conspiracy to do the things set forth in the indictment, but that the charge amounts to nothing more or less than that the defendants did the things described in the indictment; that is to say, the indictment charges that in carrying on their business the defendants did the things charged with intent to restrain the free flow of interstate commerce, but does not charge that the defendants agreed, or combined, by concerted action to accomplish an unlawful purpose, and that it charges the concerted action, or the "concurrent action," as being the conspiracy itself.

There seems to be no merit in this claim, for the reason that the defendants are distinctly charged with conspiracy in the direct restraint of trade in cash registers, and particularly the trade in cash registers carried on by the several cash register companies other than the National Cash Register Company named, and that they adopted a plan which involved the doing of certain things which were done all with the intent to restrain the free flow of interstate trade as carried on by the other concerns named. The indictment clearly charges the defendants with devising a scheme involving the doing of certain things in restraint of trade through a concerted plan adopted for the purpose and carried on through concerted action and continuous endeavor. It does not specifically allege the agreement to do the unlawful acts complained of, but the acts alleged necessarily involve a continuing agreement to do them. The "plan" is set forth, and the way it was carried out is alleged. Justice Holmes says:

"A conspiracy in restraint of trade is different from and more than a contract in restraint of trade. A conspiracy is constituted by an agreement, it is true, but it is the result of the agreement, rather than the agreement itself, just as a partnership, although constituted by a contract, is not the contract but is a result of it." United States v. Kissel, 218 U. S. 601, 608, 31 Sup. Ct. 124, 126 (54 L. Ed. 1168).

This is sufficient in the law to meet the requirements of an indictment under this statute.

201 F.—46

[6] There is no foundation for the complaint (quoting from brief of defendants'. counsel, p. 30):

"The volume of interstate trade of these concerns is not stated, nor is it sufficiently described. It does not appear that the interstate trade of any or all of the alleged competitors is substantial in amount. For all that appears in the indictment, the aggregate may have been infinitesimal."

The degree of restraint is immaterial. It is sufficient if the contract is of such a character, as, with wrongful purpose, to directly affect trade, or if it only tends to do so. If the purpose of the agreement or conspiracy is to restrain trade within the meaning of the act, it surely can make no difference if in a particular case it only affected a very small part of that trade.

"Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public." Central Ohio Salt Co. v. Guthrie, 35 Ohio St. 666, 672, cited in Northern Securities Case, 193 U. S. 197, 340, 24 Sup. Ct. 436, 48 L. Ed. 679.

Aside from this, however, the defendants misapprehend the force and meaning of the facts stated in the indictment. It is there clearly set forth that the result of the defendants' alleged methods of dealing. with the 33 cash register companies named is the increase of the business of the National Cash Register Company from about 80 per cent. of the business in cash registers, early in the 20-year period named, to about 95 per cent. in the latter part of the period. One-sixth or one-seventh of the business of making and selling cash registers cannot with accuracy be called "infinitesimal," or even small.

[7] But it is said the indictment does not charge any overt act, or, if any such act is intended to be charged, it is not charged with sufficient certainty. This objection has especial weight because of the opinion of Mr. Justice Field on the circuit in United States v. Reichert (C. C.) 32 Fed. 142, 145, who was of opinion that section 5438 of the Revised Statutes (U. S. Comp. St. 1901, p. 3674), declaring that every person who enters into any agreement, combination, or conspiracy to defraud the government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, shall be punished without requiring any act in furtherance of the conspiracy, is modified by section 5440 of the Revised Statutes (U. S. Comp. St. 1901, p. 3676), which declares that if two or more persons conspire to commit an offense against the United States or to defraud the United States in any manner, or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to the penalties specified, and that, therefore, a mere conspiracy without some overt act in execution of it is not an indictable offense.

In reaching this conclusion, Mr. Justice Field disagreed with the Circuit Judge, whose opinion to the contrary is in harmony with all of the other reported decisions on the subject—Judge Putnam, in United States v. Patterson (C. C.) 55 Fed. 605; Judge Holt, in United States v. Kissel (C. C.) 173 Fed. 823; Judges Van Devanter, Adams, and

Riner, in Smith v. United States, 157 Fed. 721, 85 C. C. A. 353; and Judge Noyes, in United States v. Patten (C. C.) 187 Fed. 664.

I agree with Judge Holt in United States v. Kissel (C. C.) 173 Fed. 823, 825, who expresses the opinion that:

"Under this statute (Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676]) a mere conspiracy is not an offense; but, in addition to the conspiracy, one or more of the parties to it must do some act to effect its object before a criminal prosecution can be maintained. * * * This indictment is necessarily brought under these provisions of the Sherman Act. No indictment can be brought in the United States courts for the offense of conspiracy at common law, because it has not been made an offense by any United States statute. Nor could this indictment have been brought under section 5440 of the United States Revised Statutes, because there is no law of the United States making a conspiracy in restraint of trade or to monopolize trade an offense against the United States except the Sherman Act, and there cannot be a conspiracy to engage in a conspiracy. Under the Sherman Act no overt act is necessary to the commission of the offense. That provides that every person who engages in a conspiracy in restraint of trade or commerce, or to monopolize trade, is guilty of the offense."

This ground of demurrer is, therefore, held to be untenable.

[8] The defendants claim, further, that the second count in the indictment is bad, in that it charges that the defendants (page 21)—

"by drawing to said the National Cash Register Company and causing that company to grasp it, monopolized a part of the trade and commerce among the several states in cash registers, that is to say, that part of said trade and commerce which, but for their use of those means, in carrying on the business and affairs of said the National Cash Register Company in the manner in said first count specified, would, during that period, have been secured or retained, as a matter of lawful right, by the divers concerns, other than said the National Cash Register Company, mentioned in said first count as having carried on business during said three years."

The objection is twofold. The first is that the "part" of trade referred to is not a part of trade and commerce within the meaning of the Anti-Trust Act, and the Standard Oil Case is cited, wherein it is said (221 U. S. 61, 31 Sup. Ct. 516, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834):

"The commerce referred to by the words 'any part' construed in the light of the manifest purpose of the statute has both a geographical and a distributive significance, that is it includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce."

The point of the objection probably is that the whole business of making and selling cash registers, as described in the first count, would only be a part of interstate commerce, and therefore it is not sufficient to allege a monopoly by drawing to the National Cash Register Company the business of the competitors mentioned; that is to say, a monopoly of a part of the part. I am unable to follow this, nor to fit the citation to the argument; for, if it is true that these defendants have drawn into the National Cash Register Company the business in cash registers that the other concerns named would have done, and through the means described in the first count, the defendants inevitably have monopolized a part of the business of making and selling cash registers. . .

In the second place, it is pointed out that the monopoly charged consists of drawing to the National Cash Register Company the business which would have been secured or retained by the other divers concerns "mentioned in said first count as having carried on business during said three years," when there are no concerns named in the first count as having carried on business during three years next preceding the finding of the indictment.

It is true there is no such allegation in the first count, and the indictment is defective in this regard; but the defect is not necessarily fatal, for it is equally true that in the first count it is alleged that those divers concerns during 20 years previous to the finding of the indictment have been engaged in the business of making and selling cash registers. If they were, then they must have carried on the busi-. ness during the three years preceding the finding of the indictment. Further than this, it may be said that the words "as having carried on business during said three years" following the words "mentioned in said first count" might be treated as surplusage. However that may be, the meaning of the pleader is plain; hence the manner of pleading does no injury to the defendants. In such case the court. ought to conserve rather than destroy the indictment.

[9] The same point is raised among the objections to the third count, and is here dealt with in the same way. The chief specific attack on the third count is that it charges only a continuance of the result of an alleged crime and does not charge any co-operation to keep it up, and is, therefore, bad under the rule stated in United States v. Kissel, 218 U. S. 601, 607, 31 Sup. Ct. 124, 125 (54 L. Ed. 1168):

"The argument, so far as the premises are true, does not suffice to prove that a conspiracy, although it exists as soon as the agreement is made, may not continue beyond the moment of making it. It is true that the unlawful agreement satisfies the definition of the crime, but it does not exhaust it. It also is true, of course, that the mere continuance of the result of a crime does not continue the crime. United States v. Irvine, 98 U. S. 450 [25 L. Ed. 193]. But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one. Take the present case. A conspiracy to restrain or monopolize trade by improperly excluding a competitor from business contemplates that the conspirators will remain in business and will continue their combined efforts to drive the competitor out until they succeed. If they do continue such efforts in pursuance of the plan the conspiracy continues up to the time of abandonment or success."

This count charges the defendants with having, before the period of three years prior to the date of the finding of the indictment, in the manner and by the means described in the first count, engaged in the conspiracy therein described, and having monopolized that part of the interstate trade in cash registers its said 33 competitors would have secured or retained, unlawfully, with knowledge, "continued to hold, conduct, and carry on said interstate business of said the National Cash Register Company, so by said means before said period augmented, and thereby have monopolized said interstate trade and commerce in cash registers." The charge, then, is that, having monopo-

lized the trade through the conspiracy and the means set forth in the first count, the defendants are guilty of monopolizing the trade continually for the three years prior to the date of the indictment; that is to say, the conspiracy having ended and the monopoly accomplished three years prior to the date of the indictment, the defendants have, during the ensuing three years, monopolized by continuing to carry on the business of the National Cash Register Company augmented by the conspiracy and by the means charged ·in the first count.

Let us suppose a case in which a concern has built itself up into greatness, enormous wealth, and practically sole possession of the trade in its particular commodity by means such as described in this indictment and by the destruction · or absorption of its competitors. The peace of desolation reigned in that trade, because its competitors were not, and it enjoyed the field alone. Thereupon its evil practices were abandoned, because there was no further occasion for them, and the three years within which, under the statute of limitations, a criminal action might be brought against it for its unlawful acts had elapsed. Is not such a concern, so built up, still a restraint of trade and a monopoly (which is the same thing), and will it not continue to be a restraint of trade and a monopoly so long as it exists?

The first section of the Anti-Trust Act is aimed at contracts, combinations, and conspiracies in restraint of trade. The second section reads:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor. * * * "

Herein are found three distinct offenses, perhaps four: Monopolizing, attempting to monopolize, and combining or conspiring to monopolize. Monopolization and attempting to monopolize are held to be distinct offenses. United States v. American Naval Stores Co; (C. C.) 186 Fed. 592. And the charge of monopolizing will support a verdict of attempting to monopolize. 1 U. S. Comp. St. 1901, p. 723.

A conspiracy to monopolize trade is one thing, and it is very like a conspiracy in restraint of trade; but the monopoly is the result of the conspiracy. It is the accomplished thing. But the statute makes the act of monopolizing also an offense, and the third count charges the defendants with that offense during the three years prior to the date of the indictment. In my judgment this is a good count. That there can be a continuing monopoly such as described in this count has not been decided in any reported case, but the government's claim finds ample support in many expressions in the opinions of judges in a number of cases. Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834; Tobacco Trust Case, 221 U. S. 176, 185, 31 Sup. Ct. 632, 55 L. Ed. 663; United States v. American Naval Stores Co. (C. C.) 172 Fed. 455, 458; United States v. Standard Oil ·Co. (C. C.) 173 Fed. 177, 191; United States v. Swift & Co. (D. C.) 186 Fed. 1002, 1013.

But, it is said, if there was any continuing monopoly it was maintained by the National Cash Register Company and not by the defend-

ants; and, further, that if a monopoly has been established as alleged, it will continue, even though these defendants may have died or have sold their stock to others, and, further, that every employé of the company; however innocent, is guilty under the statute so long as he is connected with it.

Whether or not, the company continuing to carry on business, the heirs at law or the transferees of these defendants, or other employés than the defendants, would be liable to indictment for monopolizing under the act, is not necessary to be decided now. We are concerned with the alleged acts of these defendants. It is distinctly charged (page 10 of the indictment) that they are the persons who "controlled and directed the business and affairs of said the National Cash Register Company."

The monopoly the defendants have built up is carried on by them under the name of the National Cash Register Company, controlled by them. That is what the averments in this indictment amount to. In the view of the Anti-Trust Act, the name or form, however intricate or subtly devised or maintained, under which the evils of monopoly are carried on, is altogether immaterial. No device, however skillfully contrived, and no combination by whomsoever formed, is exempt from the operation of the law, if such device or combination by its operation directly restrains commerce among the states. Northern Securities Case, 193 U. S. 197, 347, 24 Sup. Ct. 436, 48 L. Ed. 679. In the Tobacco Case, 221 U. S. 106, at pages 180, 181, 31 Sup. Ct. 632, at page 648 (55 L. Ed. 663), Chief Justice White says:

"* * * In the Standard Oil Case * * * it was pointed out that the generic designation of the first and second sections of the law, when taken together, embraced every conceivable act which could possibly come within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed. That is to say, it was held that in view of the general language of the statute and the public policy which it manifested, there was no possibility of frustrating that policy by resorting to any disguise or subterfuge of form, since resort to reason rendered it impossible to escape by any indirection the prohibitions of the statute."

[10] Finally, it is said the indictment is bad for duplicity. This may be dealt with briefly. The offenses charged grow out of the same transactions, are of the same class, and each count charges a separate and distinct offense. They may be joined in one indictment. Rev. Stat. U. S. § 1024 (U. S. Comp. St. 1901, p. 720); Pointer v. United States, 151 U. S. 396, 14 Sup. Ct. 410, 38 L. Ed. 208; Terry v. United States, 120 Fed. 483, 56 C. C. A. 633; State v. Bailey, 50 Ohio St. 636, 36 N. E. 233.

It is true that the offense of monopolizing charged in the third count is committed every day during the continuance of the monopoly, and no count may contain more than one offense; but it is the same monopoly, the continuance of which during the three years is complained of, and in reality there is but one offense, brought about through the conspiracy and illegal acts the defendants are charged with prior to the three years. But the defendants are not charged with continuing a monopoly. They are charged with monopolizing by continuing to carry on the business of the National Cash Register Company aug-

mented prior to the three years by the illegal means set forth in the first count. The illegal acts complained of have resulted in only one monopoly. A monopoly, when established, is in its very nature a continuous offense. It is here that Justice Holmes' remarks in United States v. Kissel, 218 U. S. 601, 607, 31 Sup. Ct. 124, 126 (54 L. Ed. 1168), are applicable. He says:

"But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one."

It is true he was speaking of conspiracies, but the reasoning which proves a continued conspiracy to be only one rather than a series of distinct conspiracies would demonstrate the unity of a continued monopoly.

For all of these reasons the indictment is held to be valid, and an order overruling the demurrer may be taken.